**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| HIGH IQ NETWORKS LLC,<br><br>Plaintiff,<br><br>v.<br><br>TELEFONAKTIEBOLAGET LM ERICSSON and ERICSSON INC.,<br><br>Defendants. | Case No. 2:26-cv00867<br><br>**JURY TRIAL DEMANDED** |

**<u>COMPLAINT FOR PATENT INFRINGEMENT</u>**

Plaintiff High IQ Networks LLC ("High IQ" or "Plaintiff") brings this action for patent infringement under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*, against Defendants Telefonaktiebolaget LM Ericsson ("LM Ericsson") and Ericsson Inc. ("Ericsson USA") (collectively, "Ericsson" or "Defendants"), and alleges as follows:

**<u>I. NATURE OF THE ACTION</u>**

1. This is an action for infringement of United States Patent Nos. 7,876,673 (the "'673 Patent"), 7,660,303 (the "'303 Patent"), 7,808,931 (the "'931 Patent"), and 6,952,397 (the "'397 Patent") (collectively, the "Asserted Patents"). The Asserted Patents claim inventions in carrier-grade packet transport: the prevention of frame duplication where two ring networks are interconnected through more than one node; point-to-multipoint forwarding in a Layer-2 bridged network; high-capacity forwarding across multiple overlapping rings; and the balancing of traffic in a bidirectional ring through single-direction receiving. Ericsson practices those inventions in its Router 6000 Series of IP transport routers, in the Ericsson IP Operating System ("IPOS") that runs

every router in that series, and in the networks that Ericsson builds, integrates and operates with those routers for communications service providers in the United States.

2. The Asserted Patents arose from the work of engineers at Orckit Communications Ltd. and its subsidiary Corrigent Systems Ltd., later known as Orckit-Corrigent Ltd. (together, "Orckit-Corrigent"), an Israeli technology company. Between 2001 and 2008, as carriers began to migrate from time-division multiplexing ("TDM") and SONET/SDH ring transport to packet-based Ethernet transport, Orckit-Corrigent's engineers solved a set of problems that the migration created: how to give a packet ring the resilience and balanced loading of a legacy ring; how to carry several rings' worth of capacity between the same nodes and spread traffic across them; how to interconnect rings redundantly without duplicating flooded frames; and how to deliver rooted, hub-and-spoke Layer-2 services across a bridged network. The Asserted Patents claim those solutions.

3. Ericsson knows Orckit-Corrigent and its technology well. In 2011, after a major carrier recommended that Ericsson work with Orckit-Corrigent, Ericsson's United States organization, headquartered in Plano, Texas, approved a joint Ericsson-Orckit architecture for a unified mobile and fixed network. In 2012, Ericsson personnel visited Orckit-Corrigent in Israel, an internal Ericsson review authorized testing of the joint solution in Ericsson's global laboratory in Germany, and, on information and belief, Orckit-Corrigent transferred technical information to Ericsson for integration into Ericsson's platform. On information and belief, Ericsson then discontinued the collaboration and proceeded with its own development. Every one of the Asserted Patents had issued in Orckit-Corrigent's name before Ericsson approved that joint architecture on November 25, 2011.

4. Ericsson's Router 6000 Series, introduced in 2015, implements the functionality claimed in the Asserted Patents: ITU-T G.8032 Ethernet Ring Protection Switching; virtual private LAN service ("VPLS") and hierarchical VPLS ("H-VPLS"); Ethernet VPN ("EVPN") with multihoming; and IEEE 802.3ad link aggregation, all running on IPOS (collectively with the other Ericsson products, software and services identified in Section V below, the "Accused Instrumentalities"). On information and belief, Ericsson sells or has sold those routers to communications service providers throughout the United States, deploys and integrates them through its Network Deployment services, and operates them under managed services agreements.

5. High IQ seeks damages adequate to compensate it for Ericsson's infringement, enhanced damages for Ericsson's willful infringement, its attorneys' fees, and, as to the '673, '303 and '931 Patents, which remain in force, an injunction against continued infringement.

## II. THE PARTIES

6. Plaintiff High IQ Networks LLC is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 2435 N. Central Expressway, Suite 1200, Richardson, Texas 75080. High IQ is the owner by assignment of all right, title and interest in and to each of the Asserted Patents.

7. On information and belief, Defendant Telefonaktiebolaget LM Ericsson is a corporation organized and existing under the laws of Sweden with its principal place of business at Torshamnsgatan 21, Kista, Stockholm, 164 83, Sweden. LM Ericsson is the ultimate parent of the Ericsson group of companies. Its American Depositary Shares trade on the Nasdaq Stock Market under the symbol ERIC, and it files annual reports on Form 20-F with the United States Securities and Exchange Commission. In its Annual Report on Form 20-F for the year ended December 31, 2025, filed with the Securities and Exchange Commission on March 12, 2026, LM

Ericsson identified "Ericsson Inc., 6300 Legacy Drive, Plano, Texas 75024" as its "Agent in the US."[1]

8. On information and belief, Defendant Ericsson Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 6300 Legacy Drive, Plano, Texas 75024. Ericsson USA is registered to do business in the State of Texas, and its registered agent for service of process is Capitol Corporate Services, Inc., 1501 S. Mopac Expressway, Suite 220, Austin, Texas 78746. Ericsson USA is sometimes referred to as "Ericsson North America." On information and belief, Ericsson USA is a wholly owned subsidiary of Ericsson Holding II Inc., which is in turn wholly owned by LM Ericsson, and Ericsson USA acts as the agent of LM Ericsson in the United States in importing, selling, installing, servicing and supporting Ericsson equipment and in otherwise carrying out the operations of LM Ericsson in North America. Ericsson USA has itself represented to this Court that its principal place of business is at 6300 Legacy Drive, Plano, Texas 75024. *See Ericsson Inc. v. Samsung Elecs. Co.*, No. 2:21-cv-00001-JRG, Dkt. 1 ¶ 1 (E.D. Tex. Jan. 1, 2021).

9. LM Ericsson and Ericsson USA hold themselves out to customers and to the public as a single enterprise, "Ericsson," through the website www.ericsson.com, through common branding, and through common product literature that does not distinguish between them. On information and belief, LM Ericsson, directly and through its subsidiaries, designs, develops and manufactures, or has manufactured, the Accused Instrumentalities and the IPOS software that runs

---

[1] Telefonaktiebolaget LM Ericsson, Annual Report on Form 20-F for the fiscal year ended December 31, 2025 (filed Mar. 12, 2026), cover page ("Agent in the US: Ericsson Inc., 6300 Legacy Drive, Plano, Texas 75024"), https://www.sec.gov/Archives/edgar/data/717826/000119312526104149/d948057d20f.htm (last visited Sept. 21, 2026).

them, and Ericsson USA imports them into, and sells, offers for sale, deploys, supports and operates them in, the United States, including in the State of Texas and in this District.

## III. JURISDICTION AND VENUE

1. This action arises under the patent laws of the United States, Title 35 of the United States Code, including 35 U.S.C. §§ 271, 281, 283, 284 and 285. This Court has original and exclusive subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

2. This Court has personal jurisdiction over Ericsson USA. Ericsson USA maintains its principal place of business in Plano, Texas, and is therefore at home in Texas and subject to general personal jurisdiction in this State. Ericsson USA has also committed acts of patent infringement in Texas and in this District that give rise to this action, including by importing, offering to sell, selling, deploying, using and supporting the Accused Instrumentalities in Texas and in this District, as alleged below.

3. This Court has personal jurisdiction over LM Ericsson. LM Ericsson, directly and through Ericsson USA and its other subsidiaries, intermediaries and agents, has committed acts within Texas giving rise to this action and has established minimum contacts with Texas such that the exercise of jurisdiction over it would not offend traditional notions of fair play and substantial justice. Plaintiff's claims arise from and relate to LM Ericsson's contacts with Texas, including the following, alleged on information and belief:

(a) LM Ericsson places the Accused Instrumentalities into the stream of commerce through an established distribution channel, Ericsson USA, with the knowledge and expectation that they will be offered for sale, sold, installed and used in Texas, including in this District. On information and belief, the Accused Instrumentalities are sold to, and deployed and supported in the networks of, communications service

providers whose networks serve Texas and this District, as alleged in Section V below. Ericsson's product literature for the Accused Instrumentalities is distributed in the United States through Ericsson USA without distinction among the Ericsson entities.

(b) LM Ericsson directs and controls the activities of Ericsson USA. LM Ericsson identifies Ericsson USA, at 6300 Legacy Drive, Plano, Texas, as its "Agent in the US,"[2] and Ericsson USA carries out LM Ericsson's North American operations from Plano.

(c) LM Ericsson has contracted with communications service providers that operate networks in Texas and in this District, including AT&T and Verizon, to supply network infrastructure equipment, software and services, and it directs those supply relationships at Texas. On December 4, 2023, in Dallas, Texas, AT&T and Ericsson announced a five-year agreement, reported to be worth approximately $14 billion, under which Ericsson would supply the equipment, software and services for AT&T's Open RAN network in the United States.[3] Ericsson entered into a multi-

[2] Telefonaktiebolaget LM Ericsson, Annual Report on Form 20-F for the fiscal year ended December 31, 2025 (filed Mar. 12, 2026), cover page ("Agent in the US: Ericsson Inc., 6300 Legacy Drive, Plano, Texas 75024"), https://www.sec.gov/Archives/edgar/data/717826/000119312526104149/d948057d20f.htm (last visited Sept. 21, 2026).

[3] Ericsson, AT&T to accelerate open and interoperable radio access networks (RAN) in the United States through new collaboration with Ericsson (Dec. 4, 2023), https://www.ericsson.com/en/press-releases/2023/12/att-to-accelerate-open-and-interoperable-radio-access-networks-ran-in-the-united-states-through-new-collaboration-with-ericsson (last visited Sept. 21, 2026).

year agreement with Verizon, announced in 2021, to supply 5G radio and core equipment.[4]

(d) Ericsson manufactures 5G infrastructure equipment at the Ericsson USA 5G Smart Factory in Lewisville, Texas, where, in Ericsson's words, "we manufacture the equipment that powers 5G networks across the U.S.," and Ericsson states that "over 60 percent of US mobile traffic" runs "on Ericsson equipment."[5]

(e) LM Ericsson has availed itself of this Court. LM Ericsson and Ericsson USA together sued Samsung in this District in three actions filed between December 2020 and January 2021, two of them for patent infringement,[6] and Ericsson USA has intervened in patent litigation brought against its customer AT&T in this District.[7]

4. In the alternative, to the extent LM Ericsson contends that it is not subject to jurisdiction in the courts of general jurisdiction of any state, this Court has personal jurisdiction over LM Ericsson under Federal Rule of Civil Procedure 4(k)(2), because Plaintiff's claims arise under federal law and LM Ericsson has contacts with the United States as a whole, including the

---

[4] Ericsson to partner with Verizon in $8.3 billion deal to expand 5G coverage, Dallas Morning News (July 16, 2021), https://www.dallasnews.com/business/2021/07/16/ericsson-to-partner-with-verizon-in-83-billion-deal-to-expand-5g-coverage/ (last visited Sept. 21, 2026).

[5] Ericsson's USA 5G Smart Factory, https://www.ericsson.com/en/about-us/company-facts/ericsson-worldwide/united-states/5g-smart-factory (last visited Sept. 21, 2026).

[6] *Ericsson Inc. v. Samsung Elecs. Co.*, No. 2:20-cv-00380-JRG (E.D. Tex. filed Dec. 11, 2020); *Ericsson Inc. v. Samsung Elecs. Co.*, No. 2:21-cv-00001-JRG (E.D. Tex. filed Jan. 1, 2021); *Ericsson Inc. v. Samsung Elecs. Co.*, No. 2:21-cv-00010-JRG (E.D. Tex. filed Jan. 15, 2021). Each action named Ericsson Inc. and Telefonaktiebolaget LM Ericsson as plaintiffs; the second also named Ericsson AB.

[7] *IPCom GmbH & Co. KG v. AT&T Inc.*, No. 2:20-cv-00322-JRG (E.D. Tex.) (Ericsson Inc. intervening in support of AT&T); *see id.*, Dkt. 332 (May 20, 2022) (joint motion to withdraw Ericsson Inc. as intervenor).

manufacture, importation, sale and offer for sale of the Accused Instrumentalities throughout the United States, that are sufficient to satisfy due process.

5. Venue is proper in this District as to Ericsson USA under 28 U.S.C. § 1400(b) because Ericsson USA has committed acts of infringement in this District and has a regular and established place of business in this District. Ericsson USA's regular and established places of business in this District include at least the following:

(a) Its United States headquarters at 6300 Legacy Drive, Plano, Texas 75024, in Collin County, which Ericsson holds out on its website as its "US Headquarters" and from which it manages "6,200+ US employees spread across 30+ locations."[8]

(b) The Ericsson USA 5G Smart Factory in Lewisville, Texas, in Denton County, a facility of at least 300,000 square feet with more than 550 employees that began manufacturing in 2020 and that Ericsson describes as its "first smart factory in the U.S."[9]

(c) The Ericsson Training Center of Excellence at 2555 S. Valley Parkway, Dock 90, Lewisville, Texas 75067, at which Ericsson trains its employees and its authorized service providers in courses that "range from site installation to integration, radio

[8] Ericsson in the United States, https://www.ericsson.com/en/about-us/company-facts/ericsson-worldwide/united-states (last visited Sept. 21, 2026).

[9] Ericsson in the United States, https://www.ericsson.com/en/about-us/company-facts/ericsson-worldwide/united-states (last visited Sept. 22, 2026); Ericsson's USA 5G Smart Factory, https://www.ericsson.com/en/about-us/company-facts/ericsson-worldwide/united-states/5g-smart-factory (last visited Sept. 22, 2026); Ericsson, Ericsson shows 5G USA Smart Factory to ambassadors and U.S. Department of State (Mar. 18, 2026), https://www.ericsson.com/en/news/2026/3/ericsson-shows-smart-factory-to-ambassadors-and-dep-of-state (last visited Sept. 22, 2026).

base station installation, tower and rooftop installation, microwave alignment, deployment and network integration for 3G, 4G and 5G."[10]

(d) The Global Utilities Innovation Center in Plano, Texas, which Ericsson describes as "a purpose-built operating lab to accelerate 4G and 5G solutions for utilities."[11]

Each of these is a physical place in this District. Each is a regular and established place of business at which Ericsson USA conducts its business through its own employees on a continuing basis. Each is a place of Ericsson USA: on information and belief, Ericsson USA owns or leases the premises, staffs them, lists them as its own locations on its website, and ratifies them as its places of business.

6. Ericsson USA has committed acts of infringement in this District. On information and belief, Ericsson USA imports the Accused Instrumentalities into the United States for the benefit of, and under the direction of, its Plano headquarters; offers to sell and sells the Accused Instrumentalities to communications service providers that operate networks in this District, including AT&T and Verizon, whose networks serve Plano, Sherman, Tyler, Longview, Marshall, Texarkana and other communities in this District; deploys, integrates, configures and operates the Accused Instrumentalities in networks serving this District; uses the Accused Instrumentalities in its own laboratories and facilities in this District; and trains technicians at its Lewisville facility in the deployment and integration of Ericsson network equipment, as alleged below.

---

[10] Ericsson's Training Center of Excellence, https://www.ericsson.com/en/about-us/company-facts/ericsson-worldwide/united-states/ericssons-training-center-of-excellence (last visited Sept. 21, 2026).

[11] Ericsson in the United States, https://www.ericsson.com/en/about-us/company-facts/ericsson-worldwide/united-states (last visited Sept. 21, 2026).

7. Venue is proper in this District as to LM Ericsson under 28 U.S.C. § 1391(c)(3) because LM Ericsson is a foreign corporation that does not reside in the United States and may therefore be sued in any judicial district.[12]

## IV. THE ASSERTED PATENTS

### A. The Technology

8. Telecommunications carriers historically built their metropolitan and access transport networks as rings. A ring gives every node two paths to every other node, so that a single fiber cut or node failure can be survived by sending traffic the other way around. For decades those rings carried voice and data in fixed time slots over SONET and SDH. As Internet traffic overtook voice, carriers set out to replace time-slot transport with packet transport over Ethernet, which allocates bandwidth on demand and costs far less per bit. Engineers had to give Ethernet transport the carrier-grade resilience, protection switching and service guarantees that carriers expected of a SONET ring while preserving the cost and flexibility of Ethernet. The Asserted Patents solve four of the problems that this migration created.

9. First, a packet ring had to match the resilience of a SONET ring while using the bandwidth of both directions of travel. A bidirectional ring carries traffic clockwise and counterclockwise at once, and unless the load is divided between the two rotations, a substantial part of the ring's capacity sits idle. The '397 Patent addresses that problem.

10. Second, as traffic grew, a single ring between a set of nodes was no longer enough. Carriers needed to run several rings over the same nodes and to spread traffic across them without configuring each flow by hand. The '931 Patent addresses that problem.

[12] *See In re HTC Corp.*, 889 F.3d 1349, 1354-57 (Fed. Cir. 2018) (the patent venue statute does not apply to foreign defendants, who may be sued in any judicial district in which they are subject to personal jurisdiction).

11. Third, when two rings are interconnected through more than one node for redundancy, a frame flooded onto one ring reaches every interconnect node, and unless those nodes coordinate, each will forward its copy into the second ring, duplicating the frame or looping it. The ’673 Patent addresses that problem.

12. Fourth, carriers needed to deliver Layer-2 services in which many customer sites communicate through a hub but not directly with one another, across a bridged network that learns addresses and forwards frames by destination. The ’303 Patent addresses that problem.

13. Orckit-Corrigent’s engineers, including named inventors Leon Bruckman, David Zelig, Ronen Solomon, Rafi Ram, Gal Mor, Gideon Agmon, Shachar Katz and Vladimir Kleiner, solved these problems and conceived the inventions claimed in the Asserted Patents. The United States Patent and Trademark Office (“USPTO”) examined and issued the Asserted Patents on those inventions.

**B. The ’673 Patent**

14. On January 25, 2011, the USPTO duly and legally issued United States Patent No. 7,876,673 B2, entitled “Prevention of Frame Duplication in Interconnected Ring Networks,” to inventors Rafi Ram, Leon Bruckman, Ronen Solomon and Gideon Agmon, on Application No. 12/044,158, filed March 7, 2008, which claims priority to Provisional Application No. 60/906,090, filed March 8, 2007. The ’673 Patent was assigned on its face to Corrigent Systems Ltd. The USPTO granted 319 days of patent term adjustment under 35 U.S.C. § 154(b), and the ’673 Patent remains in force until January 20, 2029. High IQ has proper and effective ownership of the ’673 Patent, including the right to sue for and recover damages for its infringement. A true and correct copy of the ’673 Patent is attached as Exhibit 1.

15. The ’673 Patent addresses the interconnection of two ring networks through two or more “interconnect nodes.” When a data packet addressed to multiple recipients is flooded across one ring, “the interconnect nodes receive respective copies of the packet.” ’673 Patent at 3:55-57. Without coordination, each interconnect node would forward its copy into the second ring, producing duplicate delivery and, in a redundant topology, forwarding loops.

16. The ’673 Patent claims an apparatus in which each interconnect node sends a synchronization message indicating its status, receives the synchronization messages of the other interconnect nodes, and, in response, takes on one of three forwarding statuses: “forward mine,” “forward none” or “forward all.” Each node extracts an attribute from the packet, for example a VLAN identifier (“the mapping function may operate on the VLAN identifier (VLAN ID) of the VLAN tag in the packet header,” *id.* at 7:12-20), and applies a predefined mapping function to that attribute to select a single node to forward the packet. A node in “forward mine” status forwards only the packets for which it is the selected node. A node in “forward none” status forwards nothing, “such as because of failure or when the node is deliberately disabled for maintenance or reconfiguration.” *Id.* at 11:16-19. When one interconnect node is prevented from forwarding, “the other interconnect node begins to forward all flooded packets regardless of the mapping function.” *Id.* at 8:62-67. The result is that exactly one copy of each flooded packet crosses from the first ring to the second, the load is shared among the interconnect nodes in normal operation, and the surviving node carries all traffic on failure.

17. The specification explains that the interconnect nodes exchange synchronization messages “so that each interconnect node is able to determine that the other interconnect node has failed,” *id.* at 8:67-9:3, and that the stations of the interconnect nodes “may also exchange synchronization messages that are used as ‘keep alive’ indications, either periodically or in

response to a state change," *id.* at 11:4-8. "Any suitable mapping function" may be used, including one that "divides the traffic load among the different interconnect nodes." *Id.* at 6:64-7:4. The parts of an interconnect node "may be geographically separate units," *id.* at 4:51-59, and the principles of the invention apply to "interconnecting rings of Ethernet Bridges or for generally interconnecting a chain of network elements (which can be modeled as an 'open ring')." *Id.* at 12:64-13:3.

18. The claims of the '673 Patent are directed to a specific, concrete improvement in the operation of network switching equipment: a defined arrangement by which redundant interconnect nodes coordinate their forwarding statuses through synchronization messages and apply a shared mapping function to packet attributes so that flooded traffic crosses between rings exactly once. That arrangement was not conventional at the time of the invention, is not an abstract idea, and cannot be performed without the claimed apparatus.

**C. The '303 Patent**

19. On February 9, 2010, the USPTO duly and legally issued United States Patent No. 7,660,303 B2, entitled "Point-to-Multipoint Functionality in a Bridged Network," to inventors Ronen Solomon, Leon Bruckman, Rafi Ram, David Zelig and Shachar Katz, on Application No. 11/508,599, filed August 22, 2006. The application was published as U.S. Patent Application Publication No. 2008/0049764 A1 on February 28, 2008. The '303 Patent was assigned on its face to Corrigent Systems Ltd. The USPTO granted 527 days of patent term adjustment, and the '303 Patent remains in force until January 31, 2028. High IQ has proper and effective ownership of the '303 Patent, including the right to sue for and recover damages for its infringement. A true and correct copy of the '303 Patent is attached as Exhibit 2.

20. The ’303 Patent addresses point-to-multipoint, or hub-and-spoke, services in a Layer-2 bridged network. In such a service, “spoke” sites communicate with a “hub” but must not communicate directly with one another, while the bridged network continues to learn addresses and forward frames by destination. The specification divides the interfaces of each switch into two types by function: “Hub-type interfaces 32 at the network edge connect nodes 30 with public networks 24, or more generally, with communication resources outside access network 20. Spoke-type interfaces 34 at the network edge connect nodes 28 with customer premises equipment, such as computer 22, or more generally, with other end-points of the access network.” ’303 Patent at 5:37-45.

21. The ’303 Patent claims an apparatus in which each switch labels frames received through interfaces of the first and second types with corresponding type indications; records in its forwarding database, together with each learned source address, a number equal to the type indication of the frame; and, when forwarding a frame, compares the stored type designation of the destination with the type indication of the frame. Frames labeled with the first type indication may be forwarded through any interface. Frames labeled with the second type indication may be forwarded through interfaces of the first type but are prevented from being forwarded through interfaces of the second type. The specification’s sample forwarding database records the type as “H” or “S” beside each learned address, *id.* at 7:19-27 (Table I), and explains that “[a]ny suitable type indication may be used to mark the frame at step 72, as long as the other nodes in network 20 are programmed to recognize the indication,” including, where the network runs over MPLS tunnels, “one of the bits of the inner pseudo-wire (PW) label.” *Id.* at 8:31-41. The bridged network “may comprise a virtual bridged network, such as a virtual private LAN service (VPLS) provisioned over an underlying Layer-2 or Layer-3 network, or a VLAN broadcast domain,” and

the interfaces may be "physical Ethernet ports" or "virtual interfaces or a mixture of physical ports and virtual interfaces." *Id.* at 5:57-64. The frame processing functions "may rather be implemented as threads or process carried out by a processing device that serves multiple ports." *Id.* at 6:66-7:3.

22. The claims of the '303 Patent are directed to a specific improvement in the operation of Layer-2 switches: a forwarding database structure that records an interface type with each learned address, a labeling of frames by ingress interface type, and a forwarding rule keyed to the comparison of the two. That structure and rule were not conventional bridge operation at the time of the invention, are not abstract, and cannot be performed without the claimed apparatus.

**D. The '931 Patent**

23. On October 5, 2010, the USPTO duly and legally issued United States Patent No. 7,808,931 B2, entitled "High Capacity Ring Communication Network," to inventors David Zelig, Leon Bruckman, Ronen Solomon, Gideon Agmon and Vladimir Kleiner, on Application No. 11/367,231, filed March 2, 2006. The application was published as U.S. Patent Application Publication No. 2007/0206618 A1 on September 6, 2007. The '931 Patent was assigned on its face to Corrigent Systems Ltd. The USPTO granted 843 days of patent term adjustment, and the '931 Patent remains in force until June 22, 2028. High IQ has proper and effective ownership of the '931 Patent, including the right to sue for and recover damages for its infringement. A true and correct copy of the '931 Patent is attached as Exhibit 3.

24. The '931 Patent addresses a communication network of multiple communication rings that share a set of ring nodes, "each ring including two unidirectional ringlets in mutually-opposite directions." '931 Patent, Abstract; *id.* at 2:22-25. The asserted claim recites at least three such rings in a concentric layout. A ring node connected to several rings accepts a packet, determines the egress ring node, identifies the subset of rings that are common to itself and the

egress node, selects a ringlet of one of those rings responsively to a header field value of the packet, and forwards the packet over the selected ringlet. The specification describes the set of common rings in link aggregation terms: "In IEEE 802.3 LAG terms, the set of possible rings is referred to as a LAG group, and each ring in the group is referred to as a member." *Id.* at 9:26-29. It describes the selection of a member by hashing: "In some embodiments, NP 58 determines the selected member by applying a hashing function to the values of one or more header fields of the packet. Any suitable hashing function known in the art can be used for this purpose. Any suitable header field or combination of fields can be used in the hashing operation, such as, for example, a source MAC address of the source node, a destination MAC address of the destination node, an IP address of the source node, an IP address of the destination node," and transport-layer port numbers. *Id.* at 9:43-53.

25. The '931 Patent defines the term "connected" by function rather than by physical attachment: "The term 'connected' is used herein to describe a certain amount of packet processing performed by the node on the packets carried by the ring and is not meant to describe a mere physical connection." *Id.* at 5:43-46. It contemplates that "[t]he different rings and ringlets are multiplexed onto the fiber-optic connection, such as using wavelength division multiplexing," *id.* at 5:23-26; equates a ringlet with a direction of travel, "the ringlet (or, equivalently, the east or west direction)," *id.* at 10:3-5; and describes the packet processor as "a packet processor, such as a network processor (NP)," *id.* at 6:53-54.

26. The claims of the '931 Patent are directed to a specific improvement in the hardware and forwarding logic of a ring node: line cards communicating with three or more rings and a network processor that resolves each packet to an egress node, to the rings common to both nodes, and to one ringlet of one of those rings selected from the packet's header fields. That

arrangement was not conventional at the time of the invention, is not abstract, and cannot be performed without the claimed device.

**E. The ’397 Patent**

27. On October 4, 2005, the USPTO duly and legally issued United States Patent No. 6,952,397 B2, entitled “Communication in a Bidirectional Ring Network with Single-Direction Receiving,” to inventors Gal Mor, Leon Bruckman and David Zelig, on Application No. 09/876,414, filed June 7, 2001. The application was published as U.S. Patent Application Publication No. 2002/0186667 A1 on December 12, 2002. The ’397 Patent was assigned on its face to Corrigent Systems Ltd. A Certificate of Correction issued on September 26, 2006. The USPTO granted 876 days of patent term adjustment, and the ’397 Patent expired on October 31, 2023. Plaintiff seeks damages for infringement of the ’397 Patent during the period beginning six years before the filing of this Complaint and ending on its expiration. High IQ has proper and effective ownership of the ’397 Patent, including the right to sue for and recover damages for its infringement. A true and correct copy of the ’397 Patent is attached as Exhibit 4.

28. The ’397 Patent addresses a bidirectional ring in which the nodes are coupled so that each can transmit in both the clockwise and counterclockwise directions at once, while at least one node, and in the claimed method a multiplicity of nodes, is configured to receive traffic in only one direction at any given time, with the receive direction of each such node selected so as to balance the traffic carried in the two directions around the ring. The specification explains that the nodes “are configured to receive data in only one selected direction at any given time,” ’397 Patent at 3:16-18; that the terms “‘clockwise’ and ‘counterclockwise,’ are used arbitrarily . . . to distinguish between the two opposing directions of packet flow in a ring network,” *id.* at 1:39-43; that the balance is approximate, so that “[a]s long as all of the nodes load the network more or less

equally, random selection of the receiver ports will generally yield approximately equal loading of rings 26 and 28," *id.* at 6:58-62; that "some of the other nodes in network 46 may have receive ports on both of the rings," *id.* at 5:59-62; and that "[a]ny suitable protocol may be used" to select the receive direction, *id.* at 5:65-67. The specification states that its principles "are similarly applicable in bidirectional ring networks and protocols of other types," including operation "over Ethernet media." *Id.* at 7:24-26, 8:25-30.

29. The claims of the '397 Patent are directed to a specific method of configuring and operating ring network hardware so that receive directions are assigned across the nodes to balance the load on the two rotations of the ring. That method was not conventional ring operation at the time of the invention, is not abstract, and cannot be performed without the claimed configuration of the nodes.

**F. Ownership, Validity and Marking**

30. High IQ has proper and effective ownership of each of the Asserted Patents. High IQ is the exclusive owner by assignment of all right, title and interest in and to each of the Asserted Patents, including the right to bring this suit for injunctive relief and damages, and including the right to sue for and to recover all past, present and future damages for infringement of the Asserted Patents.

31. Each of the Asserted Patents is presumed valid under 35 U.S.C. § 282. Neither Defendant holds a license to any of the Asserted Patents, expressly or impliedly, and neither Defendant enjoys or benefits from any right in or to any of the Asserted Patents.

32. High IQ has never made, used, sold, offered for sale or imported any product that practices the Asserted Patents, and no obligation to mark under 35 U.S.C. § 287(a) has arisen from any act of High IQ. High IQ asserts only method claims of the '397 Patent, and the marking

provisions of 35 U.S.C. § 287(a) do not apply to the assertion of method claims.[13] Plaintiff has complied with the requirements of 35 U.S.C. § 287 to the extent required by law.

## V. THE ACCUSED INSTRUMENTALITIES

33. Ericsson introduced the Router 6000 Series in February 2015 as "a key element in Ericsson's next-generation portfolio, a comprehensive suite of platforms running one network operating system (IPOS), spanning from cell-site routers to edge, mobile core and data centers."[14] Ericsson describes the Router 6000 Series as "a radio integrated, service provider SDN enabled IP transport portfolio managed by a single end-to-end management system" that "delivers high-performance connectivity for LTE, LTE-advanced and 5G-applications," and as "a set of versatile routers offering the right capacity, resilience, and form factors for diverse challenging demands of modern backhaul networks."[15]

34. Every router in the series runs the same operating system. Ericsson states: "All routers in the Ericsson Router 6000 Series run the IP Operating System (IPOS), enabling accelerated feature delivery and operational efficiencies."[16] Ericsson's own product description, reproduced in a government certification report for IPOS, states that "Ericsson routers share

[13] *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1316-17 (Fed. Cir. 2009) (marking requirement of 35 U.S.C. § 287(a) does not apply where only method claims are asserted).

[14] Ericsson, New Ericsson Router 6000 series couples radio and IP transport for 5G future (Feb. 19, 2015), https://www.ericsson.com/en/press-releases/2015/2/new-ericsson-router-6000-series-couples-radio-and-ip-transport-for-5g-future (last visited Sept. 21, 2026).

[15] Ericsson, Router 6000 Series, https://www.ericsson.com/en/portfolio/networks/ericsson-radio-system/mobile-transport/router (last visited Sept. 21, 2026).

[16] Ericsson Router 6672 Datasheet, 1/287 01-FGC 101 3442 Uen Rev T (2024), at 1, https://www.ericsson.com/495bd0/assets/global/eridoc/2152824/1-28701-FGC1013442UEN.pdf (last visited Sept. 22, 2026).

common IPOS software, features, and technology for compatibility across platforms."[17] IPOS therefore supplies a common feature set across the Router 6000 Series, and the datasheet for each model identifies the IPOS features released on that model.

35. The Ericsson Router 6273 is representative of the Accused Instrumentalities. Ericsson describes it as "a high performance modular and fully redundant aggregation router, designed to enable high quality network service delivery for RAN and fixed/mobile converged metro aggregation networks," which "supports VPN services over IP/MPLS networks, service provider SDN, service exposure using NETCONF/YANG, extensive quality of service and precise synchronization features."[18] Ericsson states that "[t]he Router 6273 is part of the Ericsson Router 6000 Series, a radio integrated and subscriber aware IP transport family of products. The Router 6000 offers a range of high-performance routers with resiliency features and form factors optimized for the various needs of metro and backhaul networks."[19]

36. The Router 6273 datasheet lists, among the product's Ethernet features, "802.1Q virtual LAN (VLAN), 802.1ad Provider Bridge, IEEE 802.3ad Link Aggregation Control Protocol, BVI – Bridged Virtual Interface, QinQ, G.8032 Ethernet Ring Protection Switching, BUM storm protection, Jumbo Frame up to 9600 bytes," and, among its Layer-2 and Layer-3 virtual private

---

[17] Standardisation Testing and Quality Certification Directorate, Government of India, Indian Common Criteria Certification Scheme, Certification Report No. STQC/CC/1314/09/CR, IPOS, Build Number IPOS Release 15.2 running on Ericsson Smart Service Routers, SSR 8020 / SSR 8010, at 4, 7 (Apr. 24, 2018), https://www.commoncriteriaportal.org/nfs/ccpfiles/files/epfiles/CR-IPOS_EAL3%20version%201.0.pdf (last visited Sept. 22, 2026) (quoting Ericsson's product description).

[18] Ericsson Router 6273 Datasheet, 1/287 01-FGC 101 3700 Uen Rev T (2024), Unless otherwise noted, each passage of this datasheet quoted in this Complaint appears in identical terms in the 2019 revision of the same document, 1/287 01-FGC 101 3700 Uen Rev F (2019), https://www.ericsson.com/495bc7/assets/global/eridoc/2152812/1-28701-FGC1013700UEN.pdf (last visited Sept. 21, 2026).

[19] Ericsson Router 6273 Datasheet, Rev T (2024), *supra*.

networking features, "L3 MPLS VPNs, 6VPE/6PE, Inter-autonomous-system MPLS VPN (options A, B, C), VPWS for E-Line Services, VPLS/H-VPLS for E-LAN Services, Pseudowire redundancy, MEF CE1.0/2.0 Compliant, Ethernet VPN for E-Line & E-LAN Services."[20] The datasheet describes a modular chassis with "[u]p to 7 Line card slots (6 LC slots for AC) that can take the following line card types -LC 2x100GE QSFP28 -LC 8x10GE/25GE SFP28 -LC 8xGE/10GE SFP+," whose "QSFP28 ports each can be configured as 4x10GE, 4x25GE, 1x40GE or 1x100GE," with "800Gbps switching capacity," and states that "[t]he Router 6273 uses merchant silicon."[21] The datasheet further lists "LFA/RLFA/TI-LFA" among the product's fast-reroute features.[22]

37. Ericsson's datasheets mark features that are not yet available with an asterisk, defined in a legend on the same page as "*Future release." In both the 2019 revision (Rev F) and the 2024 revision (Rev T) of the Router 6273 datasheet, the entry "G.8032 Ethernet Ring Protection Switching" carries no asterisk, while other entries on the same page do, including "IPSec*, IKEv2*" and "MACSec*" in the 2019 revision and "IGMP snooping*" and "IPFIX (IP Flow Information Export)*" in the 2024 revision. Ericsson removed the asterisk from "MACSec" between the two revisions, which shows that the mark tracks the release status of the feature it follows. The entries "VPLS/H-VPLS for E-LAN Services," "Ethernet VPN for E-Line & E-LAN Services" and "IEEE 802.3ad Link Aggregation Control Protocol" likewise carry no asterisk in either revision. By Ericsson's own notation, G.8032 ring protection, VPLS/H-VPLS, Ethernet

---

[20] Ericsson Router 6273 Datasheet, Rev T (2024), *supra*.

[21] Ericsson Router 6273 Datasheet, Rev T (2024), *supra*.

[22] Ericsson Router 6273 Datasheet, 1/287 01-FGC 101 3700 Uen Rev F (2019), at 2.

VPN and link aggregation are released features of the Router 6273 and were released features in 2019.[23]

38. Ericsson's datasheets for the Router 6274, Router 6371, Router 6471, Router 6672, Router 6673 and Router 6675 each list G.8032 Ethernet Ring Protection Switching, VPLS/H-VPLS and IEEE 802.3ad link aggregation. The Router 6274, Router 6672 and Router 6673 datasheets also list "Ethernet VPN for E-Line & E-LAN Services," and the Router 6371, Router 6471 and Router 6675 datasheets list "EVPN" among their IP routing and MPLS features.[24] Ericsson states that the Router 6673 "shares the same platform with Router 6273 where the line cards, power modules and fan tray of Router 6273 can be used in Router 6673."[25] Ericsson's datasheet for the Router 6678 lists "VPLS/H-VPLS for E-LAN Services" and "Ethernet VPN for E-Line & E-LAN Services" among its released features and marks G.8032 Ethernet Ring Protection Switching as a future release.[26]

---

[23] Ericsson Router 6273 Datasheet, 1/287 01-FGC 101 3700 Uen Rev F (2019), at 2; *id.*, Rev T (2024), at 2.

[24] Ericsson Router 6274 Datasheet, 1/287 01-FGC 101 2888 Uen Rev Y (2024), https://www.ericsson.com/495bc9/assets/global/eridoc/2152815/1-28701-FGC1012888UEN.pdf; Ericsson Router 6371 Datasheet, 1/287 01-FGC 101 3440 Uen Rev F (2019), https://www.winncom.com/docs/ericsson/Ericsson_Router_6371_Datasheet.pdf; Ericsson Router 6471 Datasheet, 1/287 01-FGC 101 3441 Uen Rev G (2019), https://www.winncom.com/docs/ericsson/Ericsson_Router_6471_Datasheet.pdf; Ericsson Router 6672 Datasheet, 1/287 01-FGC 101 3442 Uen Rev T (2024), https://www.ericsson.com/495bd0/assets/global/eridoc/2152824/1-28701-FGC1013442UEN.pdf; Ericsson Router 6673 Datasheet, Rev F (2024), *supra*; Ericsson Router 6675 Datasheet, 1/287 01-FGC 101 3443 Uen Rev G (2019), https://www.winncom.com/docs/ericsson/Ericsson_Router_6675_Datasheet.pdf (each last visited Sept. 22, 2026). The Router 6371, Router 6471 and Router 6675 datasheets cited are the 2019 revisions as published by an authorized Ericsson distributor.

[25] Ericsson Router 6673 Datasheet, 1/287 01-FGC 101 3863 Uen Rev F (2024), https://www.ericsson.com/495bd2/assets/global/eridoc/2152827/1-28701-FGC1013863UEN.pdf (last visited Sept. 21, 2026).

[26] Ericsson Router 6678 Datasheet, 1/287 01-FGC 101 4215 Uen Rev A (2024), https://www.ericsson.com/495bda/assets/global/eridoc/2152836/1-28701-FGC1014215UEN.pdf

39. At least the following claims of the Asserted Patents are asserted against at least the following Ericsson products:

| **Asserted Patent** | **Exemplary Asserted Claim** | **Accused Ericsson Products** |
|---|---|---|
| ’673 Patent | Claim 18 | Ericsson Router 6273, Router 6274, Router 6471, Router 6672, Router 6673 and Router 6675, each running IPOS; and Ericsson Router 6371 when deployed as a G.8032 interconnection node |
| ’303 Patent | Claim 11 | Ericsson Router 6273, Router 6274, Router 6371, Router 6471, Router 6672, Router 6673, Router 6675 and Router 6678, each running IPOS |
| ’931 Patent | Claim 29 | Ericsson Router 6273, Router 6274, Router 6371, Router 6471, Router 6672, Router 6673 and Router 6675, each running IPOS |
| ’397 Patent | Claim 15 | Ericsson Router 6273, Router 6274, Router 6371, Router 6471, Router 6672, Router 6673 and Router 6675, each running IPOS |

40. The term “Accused Instrumentalities” refers to the Ericsson Router 6000 Series routers identified above, together with the IPOS software and line cards with which they are made, sold and operated; the Ericsson Network Manager (“ENM”) and other management software through which Ericsson configures them; the networks, laboratory systems and demonstration systems that Ericsson builds, deploys, integrates, tests and operates using them; and all other Ericsson products, systems and services that operate in the same or substantially the same manner with respect to the Asserted Patents, including predecessor, successor, rebranded and variant models.

41. The foregoing identification of Accused Instrumentalities is based on the information publicly available to Plaintiff and is not intended to be, and shall not be construed as,

(last visited Sept. 22, 2026) (listing “G.8032 Ethernet Ring Protection Switching*” with the “*Future release” legend).

an exhaustive or limiting identification of all Ericsson products, services, systems, features, configurations, software, firmware or combinations thereof that infringe one or more claims of the Asserted Patents. Plaintiff reserves the right to supplement, amend or modify this identification at any time, including to add product families, models, variants, successors and rebranded versions identified through discovery, expert analysis or other investigation; to add predecessor, legacy or discontinued products for which damages may be recoverable; to identify additional infringing features, modes of operation or configurations within the products already listed; and to identify third-party products, systems or services that operate in conjunction with the Accused Instrumentalities in a manner that constitutes direct or indirect infringement. Nothing in this identification is an admission that the listed products are the only infringing instrumentalities, and the omission of any product is not an acknowledgment of non-infringement.

42. On information and belief, Ericsson sells, offers to sell and imports the Accused Instrumentalities in and into the United States, or has done so, and sells and deploys them, or has sold and deployed them, to and for communications service providers in the United States, including providers whose networks serve Texas and this District. The identities of those customers, and of the networks in which the Accused Instrumentalities are deployed, are known to Ericsson and will be established through discovery.

43. Ericsson does not merely sell the Accused Instrumentalities. Ericsson installs, configures, interconnects and integrates them for its customers. Ericsson states that its "project management, site engineering, civil works, installation, product configuration and integration capabilities cover end-to-end deployments from site acquisition to customer acceptance."[27]

[27] Ericsson, Network Deployment, https://www.ericsson.com/en/portfolio/networks/network-services/network-deployment (last visited Sept. 21, 2026).

Ericsson states that the Router 6000 portfolio "supports auto-integration with a seamless setup for the RAN transport network," which "enables the automatic discovery of the Router 6000 nodes and the automatic download of their predefined configuration," and that "each configuration is kept in sync with ENM."[28]

44. Ericsson also operates networks built from the Accused Instrumentalities. Ericsson states that "Ericsson Managed Services delivers comprehensive, end-to-end network operations and optimization, including field operations for communication services providers (CSPs)," that the "Ericsson Operations Engine is the award-winning operating model created by Ericsson to run multivendor, multi-technology network and field operations" for its managed services customers, and that its managed operations extend to "1.1M transmission and data nodes."[29] On information and belief, Ericsson operates one or more transport networks in the United States that are built from the Accused Instrumentalities under managed services agreements.

45. Ericsson further builds and operates the Accused Instrumentalities in its own facilities in the United States for development, testing, demonstration and customer trial. Ericsson states that it operates "12 R&D centers" in the United States.[30] On information and belief, Ericsson's solution engineering personnel have configured and operated the Accused Instrumentalities in the configurations described in this Complaint at one or more of those facilities, including facilities in Texas.

---

[28] Ericsson, Router 6000 Series brochure, https://www.ericsson.com/4a4692/assets/local/mobile-transport/doc/router-6000-brochure.pdf (last visited Sept. 21, 2026).

[29] Ericsson, Managed Network Services, https://www.ericsson.com/en/managed-services (last visited Sept. 21, 2026).

[30] Ericsson in the United States, https://www.ericsson.com/en/about-us/company-facts/ericsson-worldwide/united-states (last visited Sept. 21, 2026).

46. Ericsson does not publish the product documentation for IPOS. Ericsson states that "[t]he manual library of Ericsson products is part of the product deliverables and access is provided through the Extranet," and that its customer portals "provide customer specific information on products and functions, there among instructions and manuals."[31] Where an allegation in this Complaint concerns the internal operation of IPOS, it is accordingly made on information and belief, the basis for the belief is stated, and Plaintiff will confirm the allegation through discovery of Ericsson's customer product information library, technical documentation and source code.

## VI. ERICSSON'S KNOWLEDGE OF ORCKIT-CORRIGENT, ITS TECHNOLOGY AND THE ASSERTED PATENTS

47. In 2011, Bharti Airtel Limited ("Bharti"), then the largest telecommunications carrier in India, sought a unified transport network to carry both LTE mobile traffic and traditional wireline services. Bharti's incumbent suppliers included Ericsson.

48. In 2011, at Bharti's recommendation, Ericsson began discussions with Orckit-Corrigent. Orckit-Corrigent's board presentation of November 29, 2011 records that "[p]er Bharti's recommendation, Ericsson started in depth discussions with Orckit at all levels," including meetings with the Ericsson vice president responsible for the Bharti account and the Ericsson vice president responsible for third-party partnerships, and that Ericsson conducted diligence on Orckit-Corrigent, setting "guidelines for cooperation and protections in case of bankruptcy (ESCROW)."

49. On November 25, 2011, Ericsson's United States portfolio organization approved a joint Ericsson-Orckit architecture. Orckit-Corrigent's board records state that on that date "Ericsson India got 'green light' for the Ericsson Orckit Joint solution from Ericsson portfolio

---

[31] Ericsson, Instruction Manuals, https://www.ericsson.com/en/portfolio/instruction-manuals (last visited Sept. 21, 2026).

team in the HQ," and that "Ericsson recommended to propose the same solution" to two other Indian carriers.

50. In the first quarter of 2012, Ericsson's United States organization pursued a global cooperation with Orckit-Corrigent. Orckit-Corrigent's board presentation of April 29, 2012 records: "Process with Ericsson Head Quarters . . . is moving very fast. The two latest milestones were: Successful visit of Ericsson personnel in Israel in the last week of March; Internal gate in Ericsson on April 20th that result an invitation for testing of our joint solution in Ericsson global lab in Germany, testing starts next week and will last approx. 4 weeks." The same presentation records that "[t]he goal is cooperation agreement to be launched in Q4/12."

51. On information and belief, testing of the joint solution was conducted at Ericsson's laboratory in Germany beginning in May 2012, and through the second quarter of 2012 Orckit-Corrigent transferred technical information to Ericsson, in regular conference calls with Ericsson's United States organization and in a meeting in the United States between two Orckit-Corrigent vice presidents, including its vice president of research and development, and Ericsson's technical team, for the purpose of integrating the joint solution into Ericsson's platform.

52. On information and belief, Ericsson thereafter postponed the meeting that was to conclude the business agreement, discontinued the cooperation, and proceeded with internal development of its own packet transport products for the access and aggregation layers. Plaintiff will seek discovery of Ericsson's records of its evaluation of Orckit-Corrigent, the internal review of April 20, 2012, the laboratory testing in Germany, the technical information Ericsson received, and Ericsson's subsequent internal development.

53. All four Asserted Patents had issued to Corrigent Systems Ltd. before November 25, 2011: the '397 Patent on October 4, 2005; the '303 Patent on February 9, 2010; the '931 Patent

on October 5, 2010; and the ’673 Patent on January 25, 2011. Each was a matter of public record in the name of the Orckit-Corrigent entity with which Ericsson approved a joint architecture, tested a joint solution and pursued a cooperation agreement, and each claims functionality of the class at issue in that engagement: ring protection and balanced ring loading, ring interconnection, multi-ring capacity, and hub-and-spoke Layer-2 bridging. On information and belief, Ericsson, a sophisticated holder and licensor of tens of thousands of patents that conducted diligence on Orckit-Corrigent as a prospective partner and set "guidelines for cooperation and protections" before entering the engagement, reviewed Orckit-Corrigent’s publicly recorded patent portfolio, including the Asserted Patents, in the course of that diligence, or deliberately avoided doing so while believing that Orckit-Corrigent held patents covering the technology Ericsson was evaluating.

54. Ericsson’s knowledge of the ’673 Patent is also a matter of record in its own patent prosecution. The ’673 Patent and its published application, U.S. Patent Application Publication No. 2008/0222447 A1, have been cited as prior art in the prosecution of LM Ericsson’s own patent applications, including (a) U.S. Patent Application No. 13/375,982, entitled "Methods and systems for load balancing call sessions over a dual ring internet protocol (IP) network," published as U.S. Patent Application Publication No. 2012/0170573 A1 on July 5, 2012 and issued to LM Ericsson as U.S. Patent No. 9,426,186 B2 on August 23, 2016, in which the USPTO examiner cited U.S. Patent Application Publication No. 2008/0222447 A1, the published application that issued as the ’673 Patent, and which has a European counterpart, European Patent Application No. EP 2 438 730 A1, published April 11, 2012; and (b) U.S. Patent Application No. 13/146,803, entitled "Port table flushing in ethernet networks," published as U.S. Patent Application Publication No. 2011/0292833 A1 and issued to LM Ericsson as U.S. Patent No. 8,699,380 B2 on April 15, 2014,

in which the USPTO examiner cited the ’673 Patent itself.[32] Each examiner citation was mailed to LM Ericsson’s patent counsel of record during prosecution. On information and belief, LM Ericsson and its patent counsel received and reviewed those citations, and LM Ericsson has had knowledge of the ’673 Patent since no later than the examiner’s citation of it in the prosecution of Application No. 13/146,803, which issued on April 15, 2014.

55. Ericsson has had actual knowledge of the Asserted Patents and of its infringement of them no later than the date of service of this Complaint, which identifies the Asserted Patents, the asserted claims, the Accused Instrumentalities and the infringing functionality in detail.

## VII. DOCTRINE OF EQUIVALENTS AND RESERVATION OF RIGHTS

56. Each claim limitation described in Counts I through IV is literally present in the Accused Instrumentalities. In the alternative, to the extent any limitation is found not to be literally present, that limitation is present under the doctrine of equivalents, because any difference between the limitation and the corresponding feature of the Accused Instrumentalities is insubstantial, and the Accused Instrumentalities perform substantially the same function, in substantially the same way, to achieve substantially the same result as the claimed limitation.

57. The descriptions of infringement in Counts I through IV below are based on publicly available information and address one exemplary claim of each Asserted Patent as practiced by one representative Accused Instrumentality. They are illustrative and not exhaustive. Plaintiff asserts only method claims of the ’397 Patent. Plaintiff will identify all asserted claims and all Accused Instrumentalities, and will provide its detailed infringement contentions, at the

[32] U.S. Patent No. 9,426,186 B2, References Cited (listing U.S. Patent Application Publication No. 2008/0222447 A1, marked as cited by examiner), https://patents.google.com/patent/US9426186B2/en (last visited Sept. 22, 2026); U.S. Patent No. 8,699,380 B2, References Cited (listing U.S. Patent No. 7,876,673 B2, marked as cited by examiner), https://patents.google.com/patent/US8699380B2/en (last visited Sept. 22, 2026).

time required by the Local Patent Rules of this Court and the Court's scheduling order, and reserves the right to assert additional claims of the Asserted Patents, to accuse additional products, services and configurations, and to supplement its theories of infringement based on discovery of Ericsson's internal documentation, technical documentation and source code.

## VIII. CLAIMS FOR RELIEF

### COUNT I
### INFRINGEMENT OF U.S. PATENT NO. 7,876,673

58. Plaintiff realleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint.

59. Ericsson has directly infringed and continues to directly infringe at least claim 18 of the '673 Patent, literally or under the doctrine of equivalents, in violation of 35 U.S.C. § 271(a), by making, using, selling, offering for sale and importing into the United States, without authority, the Accused Instrumentalities identified above for the '673 Patent, including the Ericsson Router 6273, Router 6274, Router 6471, Router 6672, Router 6673 and Router 6675 running IPOS and configured for Ethernet VPN multihoming, and the Ericsson Router 6371 running IPOS and deployed as a G.8032 interconnection node.

60. Claim 18 of the '673 Patent recites:

> 18. A communication apparatus used in a communication network that includes multiple ring nodes arranged in at least first and second ring networks, the apparatus comprising two or more interconnect nodes that connect the first and second ring networks, wherein each interconnect node is configured: to send a synchronization message indicating the status thereof; to receive the synchronization messages of the other interconnect nodes; responsively to receiving the synchronization messages, taking on a forwarding status selected from a group consisting of: "forward mine"; "forward none"; and "forward all"; and to accept a data packet, which is sent from a source user node connected to the first ring network; to extract an attribute from the data packet; to apply a predefined mapping function to the extracted attribute so as to select a single

> interconnect node for forwarding the data packet to the second ring network; and if the interconnect node has a "forward mine" forwarding status, to forward a single copy of the data packet to the second ring network only if the interconnect node is the selected interconnect node, while refraining from forwarding a copy of the data packet if the interconnect node is not the selected interconnect node; if the interconnect node has a "forward none" forwarding status, then refraining from forwarding a copy of the data packet regardless of the predefined mapping function and the selected interconnect node; and if the interconnect node has a "forward all" forwarding status, then forwarding a singled copy of the data packet to the second ring network regardless of the predefined mapping function and the selected interconnect node.

61. The following paragraphs describe how a pair of Ericsson Router 6273 units running IPOS and deployed as Ethernet VPN multihoming provider edges meets every limitation of claim 18. The Router 6273 is representative. By describing the preamble, Plaintiff does not concede that the preamble is limiting.

62. *A communication apparatus used in a communication network.* The Router 6273 is communication apparatus used in a communication network. Ericsson describes it as "a high performance modular and fully redundant aggregation router, designed to enable high quality network service delivery for RAN and fixed/mobile converged metro aggregation networks," and as part of "a radio integrated and subscriber aware IP transport family of products" with "form factors optimized for the various needs of metro and backhaul networks."[33]

63. *A communication network that includes multiple ring nodes arranged in at least first and second ring networks.* The Router 6273 is a ring node. Ericsson's datasheet lists "G.8032 Ethernet Ring Protection Switching" among its released features.[34] The standard Ericsson names provides for networks of more than one ring: it defines an "interconnection node" as "[a]n Ethernet

[33] Ericsson Router 6273 Datasheet, Rev T (2024), *supra*.

[34] Ericsson Router 6273 Datasheet, Rev T (2024), *supra*.

ring node that is common to two or more Ethernet rings or to a sub-ring and an interconnected network" and a "major ring" as "[a]n Ethernet ring that is connected on two ports to an interconnection node," and it states that "[t]he protection protocol defined in this Recommendation enables protected point-to-point, point-to-multipoint and multipoint-to-multipoint connectivity within a ring or interconnected rings, called 'multi-ring/ladder network' topology," and that "[t]he Ethernet rings could support a multi-ring or ladder network that consists of conjoined Ethernet rings by one or more interconnection points."[35] An independent laboratory has placed Router 6000 nodes in ring and dual-ring topologies, describing one such test as measuring "a chain of Class D Boundary Clocks in a ring topology, resembling a typical real-world service provider implementation," with the Ericsson Router 6673 among the nodes that formed the ring,[36] and another as using "a dual-ring topology for this test case, interlinking two IS-IS levels," with the Ericsson Router 6676, another Router 6000 Series model running IPOS, in the topology.[37]

64. In the Ethernet VPN multihoming deployment described in this Count, the first ring network is the aggregation ring of provider-edge routers and the second ring network is the G.8032 access ring that a pair of Router 6273 units multihomes. In the alternative G.8032 deployment, the two ring networks are a major ring and a sub-ring. On information and belief, Ericsson and its customers deploy the Accused Instrumentalities in these arrangements, and Ericsson designs, markets, configures and supports the Router 6273 for that use. The basis for that belief is that IPOS

---

[35] ITU-T Recommendation G.8032/Y.1344 (03/2020), Ethernet ring protection switching, cls. 1, 3.2.4, 3.2.5 and 6, https://www.itu.int/rec/dologin_pub.asp?lang=e&id=T-REC-G.8032-202003-I!!PDF-E&type=items (last visited Sept. 21, 2026).

[36] EANTC, Multi-Vendor MPLS SDN Interoperability Test Report 2023, at 57, https://eantc.de/wp-content/uploads/2023/04/EANTC-InteropTest2023-TestReport.pdf (last visited Sept. 21, 2026).

[37] EANTC, MPLS SDN Interop 2024 Test Report v1.3, at 31, https://eantc.de/wp-content/uploads/2023/12/EANTC-MPLSSDNInterop2024-TestReport-v1.3.pdf (last visited Sept. 21, 2026).

implements G.8032, whose model of major rings, sub-rings and interconnection nodes exists to protect networks built from more than one ring; that the Router 6000 Series spans models sized for cell-site access through metro aggregation; and that the metro transport networks into which mobile operators deploy such routers are built as hierarchies of fiber rings, with access rings closed onto pairs of aggregation routers that themselves sit on an aggregation ring, because that topology gives every node two diverse paths at the least fiber cost.

65. *The apparatus comprising two or more interconnect nodes that connect the first and second ring networks.* Two Router 6273 units deployed as Ethernet VPN multihoming provider edges for a single Ethernet segment, the access ring, are two interconnect nodes that connect the access ring to the aggregation ring. Ericsson's datasheet lists "Ethernet VPN for E-Line & E-LAN Services" among the Router 6273's released features.[38] The standard that Ericsson names defines multihoming: "When all PEs attached to an Ethernet segment are allowed to forward known unicast traffic to/from that Ethernet segment for a given VLAN, then the Ethernet segment is defined to be operating in All-Active redundancy mode," and "[w]hen only a single PE, among all the PEs attached to an Ethernet segment, is allowed to forward traffic to/from that Ethernet segment for a given VLAN, then the Ethernet segment is defined to be operating in Single-Active redundancy mode."[39] An independent laboratory tested the Router 6273 in exactly that role, in a second all-active multihoming setup with three other vendors' routers, and reported that "all the multi-homed PEs were able to forward traffic to and from that Ethernet segment for a specified VLAN. The traffic flow was load-balanced to both PE1 and PE2, and we observed no

---

[38] Ericsson Router 6273 Datasheet, Rev T (2024), *supra*.

[39] IETF RFC 7432, BGP MPLS-Based Ethernet VPN § 3 (Feb. 2015), https://www.rfc-editor.org/rfc/rfc7432.txt (last visited Sept. 21, 2026).

loss of traffic."[40] Reporting those results, Ericsson stated that EVPN "also supports multi-homing for finer granularity load sharing as well as increased network resilience and mixture of Ethernet and IP services through integrated routing and bridging model."[41]

66. In the alternative G.8032 deployment, the standard likewise provides two interconnect nodes between two rings: "Ethernet ring nodes C and D, which are common to both ERP1 and ERP2, are called the interconnection nodes."[42] Ericsson's own patent filings describe pairs of interconnect nodes joining an Ethernet ring to another network, including "a pair of interface nodes between the Ethernet ring and a VPLS-domain"[43] and "an interconnection node (103)" in "an ERPS network."[44] The '673 Patent itself contemplates that the components of an interconnect node "may be geographically separate units" and that rings may be joined by more than two nodes. '673 Patent at 4:51-59, 5:15-20.

---

[40] EANTC, Multi-Vendor MPLS SDN Interoperability Test Report 2023, at 26-27, https://eantc.de/wp-content/uploads/2023/04/EANTC-InteropTest2023-TestReport.pdf (last visited Sept. 21, 2026); *see also id.* at 6, 18 (Tables 2 and 3, listing "Huawei NetEngine 8000 F8 with Ericsson 6273" and "Juniper MX204 with Ericsson 6273" among the multi-homing and E-Line peerings).

[41] Ericsson steps up efforts to reduce complexity in transport networks (June 1, 2023), https://www.ericsson.com/en/news/2023/5/ericsson-steps-up-efforts-to-reduce-complexity-in-transport-networks (last visited Sept. 21, 2026).

[42] ITU-T Recommendation G.8032/Y.1344 (03/2020), Ethernet ring protection switching, cl. 9.7, https://www.itu.int/rec/dologin_pub.asp?lang=e&id=T-REC-G.8032-202003-I!!PDF-E&type=items (last visited Sept. 21, 2026).

[43] WO 2011/123001 A1 (Telefonaktiebolaget LM Ericsson), Method for protection against superloops in an Ethernet ring, Abstract, https://patents.google.com/patent/WO2011123001A1/en (last visited Sept. 21, 2026).

[44] WO 2020/016901 A1 (Telefonaktiebolaget LM Ericsson), *A Method in an Ethernet Ring Protection Switching (ERPS) Network of Handling a Sub-Ring Link Failure* (published Jan. 23, 2020), Abstract, https://patents.google.com/patent/WO2020016901A1/en (last visited Sept. 22, 2026).

67. *Wherein each interconnect node is configured.* Each Router 6273 of the pair runs IPOS and is configured with Ethernet VPN and G.8032 Ethernet ring protection, both of which appear on Ericsson's datasheet as released features, to perform the operations described below.[45]

68. *To send a synchronization message indicating the status thereof.* Each Router 6273 of the multihoming pair advertises a BGP Ethernet Segment route announcing that it is attached to the segment and participating in forwarding, and withdraws that route when it is not. The standard provides: "When a PE discovers the ESI of the attached Ethernet segment, it advertises an Ethernet Segment route with the associated ES-Import extended community attribute," and "[i]n the case of link or port failure, the affected PE withdraws its Ethernet Segment route. This will re-trigger the service carving procedures on all the PEs in the redundancy group."[46] An Ethernet Segment route is a message that each interconnect node sends to the others stating that it is attached to the segment and participating in the designated-forwarder election, and its withdrawal states that it is not. That is a synchronization message indicating the status of the sending node, and it is the input to the status each node takes on. In the alternative G.8032 deployment, the interconnect nodes send R-APS messages reporting their state.

69. *To receive the synchronization messages of the other interconnect nodes.* Each Router 6273 receives the Ethernet Segment routes of the other provider edges attached to the same segment and builds its list of peers from them: "The PE then starts a timer (default value = 3 seconds) to allow the reception of Ethernet Segment routes from other PE nodes connected to the same Ethernet segment," and "[w]hen the timer expires, each PE builds an ordered list of the IP

---

[45] Ericsson Router 6273 Datasheet, Rev T (2024), *supra*.

[46] IETF RFC 7432, BGP MPLS-Based Ethernet VPN § 8.5 (Feb. 2015), https://www.rfc-editor.org/rfc/rfc7432.txt (last visited Sept. 21, 2026); *see also id.* § 8.2 (Ethernet A-D per ES route and its withdrawal).

addresses of all the PE nodes connected to the Ethernet segment (including itself), in increasing numeric value."[47]

70. *Responsively to receiving the synchronization messages, taking on a forwarding status selected from a group consisting of "forward mine," "forward none" and "forward all."* In response to the Ethernet Segment routes it receives, each Router 6273 of the pair takes on one of three forwarding conditions for the segment. In the ordinary elected state it forwards only the traffic assigned to it: "The PE that is elected as a DF for a given <ES, VLAN> or <ES, VLAN bundle> will unblock multi-destination traffic for that VLAN or VLAN bundle on the corresponding ES. Note that the DF PE unblocks multi-destination traffic in the egress direction towards the segment. All non-DF PEs continue to drop multi-destination traffic in the egress direction towards that <ES, VLAN> or <ES, VLAN bundle>."[48] That is the "forward mine" status. A provider edge whose segment is down, or that is waiting for its peers' routes, acts as non-designated forwarder for every VLAN regardless of any election result: "ANY_STATE on ES_DOWN: (i) Stop the DF Wait timer. (ii) Assume an NDF for the local PE," and "DF_WAIT on entering the state: (i) Start the DF Wait timer if not started already or expired. (ii) Assume an NDF for the local PE."[49] That is the "forward none" status. When the other provider edge withdraws its route, the surviving provider edge forwards all traffic for the segment: "In the case of link or port failure, the affected PE withdraws its Ethernet Segment route. This will re-trigger

---

[47] IETF RFC 7432, BGP MPLS-Based Ethernet VPN § 8.5 (Feb. 2015), https://www.rfc-editor.org/rfc/rfc7432.txt (last visited Sept. 21, 2026).

[48] IETF RFC 7432, BGP MPLS-Based Ethernet VPN § 8.5 (Feb. 2015), https://www.rfc-editor.org/rfc/rfc7432.txt (last visited Sept. 21, 2026).

[49] IETF RFC 8584, Framework for Ethernet VPN Designated Forwarder Election Extensibility § 2.1 (Apr. 2019), https://www.rfc-editor.org/rfc/rfc8584.txt (last visited Sept. 21, 2026).

the service carving procedures on all the PEs in the redundancy group."[50] That is the "forward all" status. An independent laboratory observed the first and third conditions in multihoming tests in which the Router 6273 took part: "In the next step, we observed the DF and non-DF PEs in single-active multi-homed devices and flow-based traffic load balancing in all-active multi-homed devices," and "[w]e then simulated a link failure on one of the links and observed that the traffic continued to flow through the second PE."[51]

71. On information and belief, IPOS on the Router 6273 implements each of the three conditions: the node forwards the VLANs the election assigns to it; the node forwards nothing while its ring-side attachment is down, while it is isolated from the core, or while the hold-down timer runs after peer discovery; and the node forwards every VLAN once its peer has withdrawn and it alone remains. Each condition is taken on in response to the synchronization messages, and together they form the closed group of "forward mine," "forward none" and "forward all." The names in the claim are the patentee's, and the claim does not require Ericsson to adopt them.

72. *To accept a data packet, which is sent from a source user node connected to the first ring network.* Broadcast, unknown-unicast and multicast packets sent by a user reached through the aggregation ring are delivered to both Router 6273 units serving the segment, and each accepts its copy. That duplicate delivery is the reason the designated-forwarder election exists: "All non-DF PEs continue to drop multi-destination traffic in the egress direction towards that <ES, VLAN>."[52] A provider edge cannot drop what it has not accepted. The '673 Patent describes

---

[50] IETF RFC 7432, BGP MPLS-Based Ethernet VPN § 8.5 (Feb. 2015), https://www.rfc-editor.org/rfc/rfc7432.txt (last visited Sept. 21, 2026).

[51] EANTC, Multi-Vendor MPLS SDN Interoperability Test Report 2023, at 6, 26, https://eantc.de/wp-content/uploads/2023/04/EANTC-InteropTest2023-TestReport.pdf (last visited Sept. 21, 2026).

[52] IETF RFC 7432, BGP MPLS-Based Ethernet VPN § 8.5 (Feb. 2015), https://www.rfc-editor.org/rfc/rfc7432.txt (last visited Sept. 21, 2026).

the same condition: "When a data packet is flooded across one of the rings, the interconnect nodes receive respective copies of the packet." '673 Patent at 3:55-57.

73. *To extract an attribute from the data packet.* Each Router 6273 determines the VLAN of the packet from the packet itself, from its VLAN tag or from the service label of the VLAN-based service, because the designated-forwarder filter is applied per Ethernet segment and VLAN: "for VLAN-based service, the PE with ordinal i is the DF for an <ES, VLAN V> when (V mod N) = i."[53] In Ericsson's own words, an interconnect node determines whether it "is active for the service associated with the decapsulated frames by means of the VLAN identifiers contained in the frames."[54] The VLAN identifier is an attribute of the packet, and the '673 Patent gives it as the example: "the mapping function may operate on the VLAN identifier (VLAN ID) of the VLAN tag in the packet header." '673 Patent at 7:12-20.

74. *To apply a predefined mapping function to the extracted attribute so as to select a single interconnect node for forwarding the data packet to the second ring network.* The service-carving rule of Ethernet VPN is a predefined mapping function applied to the packet's VLAN value that selects exactly one Router 6273 to forward the packet to the access ring: "Assuming a redundancy group of N PE nodes, for VLAN-based service, the PE with ordinal i is the DF for an <ES, VLAN V> when (V mod N) = i."[55] The alternative designated-forwarder election algorithm

---

[53] IETF RFC 7432, BGP MPLS-Based Ethernet VPN § 8.5 (Feb. 2015), https://www.rfc-editor.org/rfc/rfc7432.txt (last visited Sept. 21, 2026).

[54] EP 2 652 916 B1 (Telefonaktiebolaget LM Ericsson), *Data Plane for Resilient Network Interconnect*, claim 7, https://patents.google.com/patent/EP2652916B1/en (last visited Sept. 22, 2026).

[55] IETF RFC 7432, BGP MPLS-Based Ethernet VPN § 8.5 (Feb. 2015), https://www.rfc-editor.org/rfc/rfc7432.txt (last visited Sept. 21, 2026).

standardized for Ethernet VPN is likewise a predefined function of the VLAN.[56] Every node in the redundancy group holds the same function and arrives at the same answer, so exactly one Router 6273 forwards any given packet to the second ring network. The ’673 Patent describes the mapping function in the same way: “the function may produce an index of the single interconnect node that is to forward the packet.” ’673 Patent at 6:32-44. A table that holds the precomputed result of the function for each VLAN, indexed by the VLAN of each arriving packet, is that function applied to that attribute.

75. *If the interconnect node has a “forward mine” forwarding status, to forward a single copy of the data packet to the second ring network only if the interconnect node is the selected interconnect node, while refraining from forwarding a copy of the data packet if the interconnect node is not the selected interconnect node.* In single-active multihoming, the Router 6273 selected by the mapping function forwards a single copy of the packet to the segment, and the other provider edge of the pair refrains from forwarding a copy. The designated forwarder “will unblock multi-destination traffic for that VLAN or VLAN bundle on the corresponding ES,” while “[a]ll non-DF PEs continue to drop multi-destination traffic in the egress direction.”[57] In single-active mode, “only a single PE, among all the PEs attached to an Ethernet segment, is allowed to forward traffic to/from that Ethernet segment for a given VLAN,”[58] and the designated forwarder is responsible for “[s]ending unicast traffic on a given Ethernet Tag on a particular ES to the CE.

---

[56] IETF RFC 8584, Framework for Ethernet VPN Designated Forwarder Election Extensibility § 3.2 (Apr. 2019), https://www.rfc-editor.org/rfc/rfc8584.txt (last visited Sept. 21, 2026).

[57] IETF RFC 7432, BGP MPLS-Based Ethernet VPN § 8.5 (Feb. 2015), https://www.rfc-editor.org/rfc/rfc7432.txt (last visited Sept. 21, 2026).

[58] IETF RFC 7432, BGP MPLS-Based Ethernet VPN § 3 (Feb. 2015), https://www.rfc-editor.org/rfc/rfc7432.txt (last visited Sept. 21, 2026).

This is valid for Single-Active multihoming."[59] An independent laboratory observed the Router 6273 in that mode: "we observed the DF and non-DF PEs in single-active multi-homed devices."[60] Ericsson's own published interconnect design forwards each service through exactly one selected node, "a single Active (gateway) node within a VN for a service,"[61] and tests "Active node?" in the data plane before a frame is forwarded.[62]

76. *If the interconnect node has a "forward none" forwarding status, then refraining from forwarding a copy of the data packet regardless of the predefined mapping function and the selected interconnect node.* A Router 6273 whose segment attachment is down, or that is still waiting for its peer's routes, assumes the non-designated-forwarder role for every VLAN, whatever the mapping function would return: "ANY_STATE on ES_DOWN: (i) Stop the DF Wait timer. (ii) Assume an NDF for the local PE."[63] On information and belief, IPOS on the Router 6273 implements that status, and a Router 6273 in that condition sends no copy of a packet from the first ring toward the second ring for any VLAN, including the VLANs the mapping function would otherwise assign to it. The basis for that belief is that Ericsson lists Ethernet VPN among the Router 6273's released features and that the designated-forwarder state machine quoted above

[59] IETF RFC 8584, Framework for Ethernet VPN Designated Forwarder Election Extensibility § 1.2 (Apr. 2019), https://www.rfc-editor.org/rfc/rfc8584.txt (last visited Sept. 21, 2026).

[60] EANTC, Multi-Vendor MPLS SDN Interoperability Test Report 2023, at 6, https://eantc.de/wp-content/uploads/2023/04/EANTC-InteropTest2023-TestReport.pdf (last visited Sept. 21, 2026).

[61] J. Farkas (Ericsson), Resilient Network Interconnect Functionalities, IEEE 802.1 contribution (Sept. 2010), https://www.ieee802.org/1/files/public/docs2010/new-farkas-network-interconnect-functionalities-0910-v01.pdf (last visited Sept. 21, 2026).

[62] J. Farkas (Ericsson), Data Plane for Resilient Network Interconnect, IEEE 802.1 contribution (Jan. 2011), https://www.ieee802.org/1/files/public/docs2011/new-farkas-RNI-data-plane-0111-v02.pdf (last visited Sept. 21, 2026).

[63] IETF RFC 8584, Framework for Ethernet VPN Designated Forwarder Election Extensibility § 2.1 (Apr. 2019), https://www.rfc-editor.org/rfc/rfc8584.txt (last visited Sept. 21, 2026).

specifies that a provider edge whose segment attachment is down assumes the non-designated-forwarder role for every VLAN. The '673 Patent describes the status in the same terms: the node "does not forward any packets, such as because of failure or when the node is deliberately disabled for maintenance or reconfiguration." '673 Patent at 11:16-19.

77. *If the interconnect node has a "forward all" forwarding status, then forwarding a singled copy of the data packet to the second ring network regardless of the predefined mapping function and the selected interconnect node.* When the peer's Ethernet Segment route is withdrawn, the surviving Router 6273 forwards every packet to the segment, whatever the packet's VLAN: "In the case of link or port failure, the affected PE withdraws its Ethernet Segment route. This will re-trigger the service carving procedures on all the PEs in the redundancy group."[64] The candidate list itself is pruned on withdrawal: "a PE's IP address MUST be removed from the ES candidate list if its Ethernet A-D per ES route is withdrawn."[65] An independent laboratory observed the result in tests in which the Router 6273 took part: "We then simulated a link failure on one of the links and observed that the traffic continued to flow through the second PE."[66] On information and belief, IPOS on the Router 6273 implements that status, and upon withdrawal of the peer's route the surviving node forwards a single copy of each packet of every VLAN into the second ring without regard to the value the mapping function would have returned over the former candidate list. The basis for that belief is the mandatory language of the standards quoted above, under which withdrawal of the peer's Ethernet Segment route re-triggers the procedure and the

---

[64] IETF RFC 7432, BGP MPLS-Based Ethernet VPN § 8.5 (Feb. 2015), https://www.rfc-editor.org/rfc/rfc7432.txt (last visited Sept. 21, 2026).

[65] IETF RFC 8584, Framework for Ethernet VPN Designated Forwarder Election Extensibility § 4 (Apr. 2019), https://www.rfc-editor.org/rfc/rfc8584.txt (last visited Sept. 21, 2026).

[66] EANTC, Multi-Vendor MPLS SDN Interoperability Test Report 2023, at 26, https://eantc.de/wp-content/uploads/2023/04/EANTC-InteropTest2023-TestReport.pdf (last visited Sept. 21, 2026).

peer "MUST be removed from the ES candidate list," leaving the surviving node as the only candidate for every VLAN of the segment. The '673 Patent defines the status by its trigger and its result, not by the computation that produces it: a copy is forwarded "irrespective of the mapping function responsively to an event that prevents a second interconnect node from forwarding the copy," '673 Patent at 2:5-8; in such cases "the other interconnect node should forward all flooded packets, irrespective of the mapping function," *id.* at 8:27-29; and the "forward all" state is one "in which the node forwards all packets, such as when the other interconnect node does not forward packets." *Id.* at 11:21-23. The "predefined mapping function" of claim 1 is the function defined for the group of interconnect nodes before the event, here the assignment of each VLAN to one of the ordered provider edges of the redundancy group. When the peer withdraws, the surviving node forwards the packets of every VLAN, including the VLANs that function assigned to the withdrawn peer, and it therefore forwards regardless of that function and of the interconnect node it selected. Whether IPOS effects the transition by marking the surviving node the forwarder of every VLAN, or by re-running the modulo over a candidate list of one, in which every VLAN maps to the only remaining ordinal, is a matter within Ericsson's knowledge; on either implementation the node forwards every packet regardless of the predefined mapping function and the interconnect node it selected, which is the claimed status and the behavior the '673 Patent describes: when one interconnect node is prevented from forwarding, "the other interconnect node begins to forward all flooded packets regardless of the mapping function." *Id.* at 8:62-67.

78. The Router 6274, Router 6471, Router 6672, Router 6673 and Router 6675 run the same IPOS software and, according to Ericsson's datasheets, implement G.8032 Ethernet Ring Protection Switching and Ethernet VPN, listed as "Ethernet VPN for E-Line & E-LAN Services" or as "EVPN," and each of them meets every limitation of claim 18 in the same manner as the

Router 6273 when deployed in pairs as Ethernet VPN multihoming provider edges. The Router 6371 runs the same IPOS software, implements G.8032 Ethernet Ring Protection Switching and lists "EVPN" among its routing features, and meets every limitation of claim 18 in the manner described above for the alternative G.8032 deployment when deployed as one of a pair of interconnection nodes between a major ring and a sub-ring.

79. Ericsson makes the apparatus of claim 18 when its own personnel install, configure and interconnect pairs of the Accused Instrumentalities as multihoming provider edges, or as G.8032 interconnection nodes, for a customer in the United States. Ericsson states that its "project management, site engineering, civil works, installation, product configuration and integration capabilities cover end-to-end deployments from site acquisition to customer acceptance."[67] Ericsson uses the apparatus of claim 18 when it operates a customer's transport network built from the Accused Instrumentalities under a managed services agreement, through the "end-to-end network operations" and "field operations" that Ericsson Managed Services delivers.[68] Ericsson makes and uses the apparatus of claim 18 when it builds and operates the Accused Instrumentalities in the claimed arrangement in its own facilities in the United States for development, testing, demonstration and customer trial. Ericsson sells, offers to sell and imports the apparatus of claim 18 when it sells, offers to sell and imports pairs of the Accused Instrumentalities together with the IPOS software that configures them as interconnect nodes and the deployment and integration services by which Ericsson itself interconnects them. On information and belief, LM Ericsson manufactures, or has manufactured, the Accused Instrumentalities and the IPOS software and

---

[67] Ericsson, Network Deployment, https://www.ericsson.com/en/portfolio/networks/network-services/network-deployment (last visited Sept. 21, 2026).

[68] Ericsson, Managed Network Services, https://www.ericsson.com/en/managed-services (last visited Sept. 21, 2026).

supplies them for importation into and sale in the United States, and Ericsson USA imports, sells, offers to sell, installs and operates them in the United States, including in this District.

80. Each communications service provider that owns and operates a network built from the Accused Instrumentalities in the arrangement described above makes and uses the apparatus of claim 18 and directly infringes the '673 Patent.

81. Ericsson has induced and continues to induce the infringement of at least claim 18 of the '673 Patent by its customers and other third parties in violation of 35 U.S.C. § 271(b). Ericsson has known of the '673 Patent and of the infringing nature of the Accused Instrumentalities at least since the date of service of this Complaint, and, on information and belief, since its engagement with Orckit-Corrigent in 2011 and 2012 and since the citation of the '673 Patent and its published application in the prosecution of its own patent applications, as alleged in Section VI above. With that knowledge, and with the specific intent that its customers make and use the Accused Instrumentalities in the infringing arrangement, Ericsson has taken and continues to take active steps to encourage and facilitate that infringement, including by: designing IPOS to implement Ethernet VPN multihoming and G.8032 ring interconnection and marketing those features as released capabilities of the Accused Instrumentalities; publishing datasheets, brochures and technical literature that instruct customers to deploy the Accused Instrumentalities in redundant, multihomed ring topologies; supplying customers with IPOS instruction manuals and configuration guides through its customer Extranet; installing, configuring and interconnecting the Accused Instrumentalities for customers through its Network Deployment services; provisioning customers' routers through ENM auto-integration, which downloads to each node "their predefined configuration" and keeps "each configuration . . . in sync with ENM"; training customers' and partners' personnel in "deployment and network integration" at its Training Center

of Excellence in Lewisville, Texas and elsewhere; and providing technical support, software updates and managed services for the deployed networks. Ericsson knows, or is willfully blind to the fact, that the use of the Accused Instrumentalities in the manner it instructs infringes the '673 Patent, and its customers have directly infringed and continue to directly infringe as a result.

82. Ericsson has contributorily infringed and continues to contributorily infringe at least claim 18 of the '673 Patent in violation of 35 U.S.C. § 271(c) by selling, offering to sell and importing into the United States the Accused Instrumentalities, including the Router 6000 Series routers and the IPOS software that implements Ethernet VPN multihoming designated-forwarder election and G.8032 ring interconnection, knowing that those components constitute a material part of the invention of claim 18, that they are especially made and especially adapted for use in an infringing manner, and that they are not staple articles or commodities of commerce suitable for substantial non-infringing use. On information and belief, the Ethernet VPN designated-forwarder election and G.8032 interconnection functions of IPOS have no substantial non-infringing use: the designated-forwarder election exists only to coordinate the forwarding of redundant nodes that join one network to another, G.8032 interconnection exists only to join rings, and the carrier transport networks into which Ericsson sells the Accused Instrumentalities are built as hierarchies of rings, as alleged above. The Accused Instrumentalities are sold to communications service providers for deployment in exactly those arrangements, and Ericsson has known of the '673 Patent since at least the service of this Complaint and, on information and belief, since 2011 and 2012 and since the citation of the '673 Patent in the prosecution of its own patent applications.

83. In the alternative, since at least its diligence on and engagement with Orckit-Corrigent in 2011 and 2012, since the citation of the '673 Patent in the prosecution of its own

patent applications, and in any event since the service of this Complaint, Ericsson has subjectively believed that there was a high probability that the Accused Instrumentalities, and their use in the manner Ericsson instructs, infringe the ’673 Patent, and has taken deliberate actions to avoid confirming that fact.

84. Ericsson’s infringement of the ’673 Patent has been and continues to be willful. Ericsson has known of Orckit-Corrigent and of the technology claimed in the ’673 Patent since 2011, when it conducted diligence on Orckit-Corrigent, approved a joint architecture, tested a joint solution and sought to integrate it into its own platform, and then proceeded with its own development, and, on information and belief, Ericsson knew of, or was willfully blind to, the ’673 Patent from that time and knew of the ’673 Patent no later than its citation in the prosecution of Ericsson’s own patent applications. Since at least the service of this Complaint, Ericsson has had actual knowledge of the ’673 Patent and of its infringement, and, on information and belief, has continued to make, use, sell, offer for sale and import the Accused Instrumentalities and to induce and contribute to their infringing use, without a license and without any good-faith basis to believe that it does not infringe or that the ’673 Patent is invalid. Ericsson’s deliberate and intentional infringement warrants enhanced damages under 35 U.S.C. § 284 and renders this an exceptional case under 35 U.S.C. § 285.

85. Plaintiff has suffered and continues to suffer damages as a result of Ericsson’s infringement of the ’673 Patent. Ericsson is liable to Plaintiff under 35 U.S.C. § 284 for damages in an amount adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by Ericsson, together with interest and costs. Ericsson’s infringement has caused and will continue to cause Plaintiff irreparable injury for which there is no adequate remedy at law unless Ericsson is enjoined by this Court.

**COUNT II**
**INFRINGEMENT OF U.S. PATENT NO. 7,660,303**

86. Plaintiff realleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint.

87. Ericsson has directly infringed and continues to directly infringe at least claim 11 of the '303 Patent, literally or under the doctrine of equivalents, in violation of 35 U.S.C. § 271(a), by making, using, selling, offering for sale and importing into the United States, without authority, the Accused Instrumentalities identified above for the '303 Patent, including the Ericsson Router 6273, Router 6274, Router 6371, Router 6471, Router 6672, Router 6673, Router 6675 and Router 6678 running IPOS and configured to deliver hierarchical VPLS or Ethernet VPN E-LAN and E-Tree services.

88. Claim 11 of the '303 Patent recites:

> 11. Apparatus for communication, comprising a group of switches, which are coupled together in a Layer-2 bridged network, each switch comprising: multiple network interfaces, which are configured so that at least one interface of at least one of the switches is configured as a first type of the interfaces, and a plurality of other interfaces are configured as a second type of the interfaces; and a frame processor, which is operative: to create an entry comprising a source address of the frame and a number equal to a type indication of the frame to identify the first interface, and to add the entry to a forwarding database containing an identification of at least a second interface through which the frame should be forwarded and a type designation of the destination address as being associated with the first or second type of the interfaces; upon receiving through a first interface of a given switch a frame comprising a given destination address, to look up the destination address in the forwarding database, and to compare the type designation with a type indication of the frame in order to determine whether to forward the frame through the second interface; upon receiving frames through the interfaces of the first and second types for transmission over the network, to label the received frames with corresponding first and second type indications, and to cause the interfaces to forward the frames through the Layer-2 bridged network responsively to the type indications, by permitting the frames that are labeled with the

> first type indication to be transmitted through any of the interfaces, while permitting the frames that are labeled with the second type indication to be transmitted through the interfaces of the first type and preventing the frames that are labeled with the second type indication from being transmitted through the interfaces of the second type; and to update the forwarding database using a database learning process responsively to the source address and to the type indication of the frame.

89. The following paragraphs describe how a group of Ericsson Router 6273 units running IPOS and coupled together in a hierarchical VPLS bridge domain meets every limitation of claim 11. The Router 6273 is representative. Plaintiff pleads this Count on two alternative and independent grounds and does not contend that both must be established. The first ground is the hierarchical virtual private LAN service that Ericsson's own datasheet names, in which the two types of interface are the spoke connection to a multi-tenant unit, which is the first type, and the hub pseudowires to the other provider-edge devices, which are the second type, and which the governing standard forwards differently. The second ground, pleaded in the alternative, is the Ethernet Tree ("E-Tree") service delivered over Ethernet VPN, in which the two types of interface are root attachment circuits, which are the first type, and leaf attachment circuits, which are the second type. On information and belief, IPOS delivers E-Tree service over Ethernet VPN in accordance with IETF RFC 8317. The basis for that belief is that Ericsson's datasheet names Ethernet VPN E-LAN service as a released feature, that RFC 8317 defines E-Tree as a rooted-multipoint form of that service built from the same routes and labels, and that Ericsson's own patents describe E-Tree implementations in the terms of that standard, as alleged below. By describing the preamble, Plaintiff does not concede that the preamble is limiting.

90. *Apparatus for communication, comprising a group of switches, which are coupled together in a Layer-2 bridged network.* Router 6273 units running IPOS are provider-edge switches coupled together in VPLS, H-VPLS and Ethernet VPN E-LAN bridge domains, which

are Layer-2 bridged networks. Ericsson's datasheet lists "VPLS/H-VPLS for E-LAN Services" and "Ethernet VPN for E-Line & E-LAN Services" among the Router 6273's released features.[69] An independent laboratory tested the Router 6273 as a provider-edge switch coupled with other switches in an Ethernet VPN E-LAN bridge domain, describing E-LAN as "[a] multipoint-to-multipoint Ethernet VPN [that] seamlessly interconnects customer sites while presenting each location as a single Ethernet segment to all other sites," with the "Ericsson 6273" among the devices that "participated as single-homed PEs."[70] On information and belief, groups of Router 6000 units are coupled together in such bridge domains in networks in the United States. The '303 Patent confirms that a virtual bridged network is a Layer-2 bridged network within the claim: "network 26 may comprise a virtual bridged network, such as a virtual private LAN service (VPLS) provisioned over an underlying Layer-2 or Layer-3 network, or a VLAN broadcast domain." '303 Patent at 5:59-62.

91. *Each switch comprising multiple network interfaces.* Each Router 6273 has multiple network interfaces on its line cards, "LC 2x100GE QSFP28," "LC 8x10GE/25GE SFP28" and "LC 8xGE/10GE SFP+," each QSFP28 port of which "can be configured as 4x10GE, 4x25GE, 1x40GE or 1x100GE," together with the virtual interfaces, the attachment circuits and pseudowires, of each bridge domain.[71] The '303 Patent states that the claimed interfaces may be "physical Ethernet ports" or, in a virtual bridged network such as VPLS, "virtual interfaces or a mixture of physical ports and virtual interfaces." '303 Patent at 5:62-64.

---

[69] Ericsson Router 6273 Datasheet, Rev T (2024), *supra*.

[70] EANTC, Multi-Vendor MPLS SDN Interoperability Test Report 2023, at 6-7, https://eantc.de/wp-content/uploads/2023/04/EANTC-InteropTest2023-TestReport.pdf (last visited Sept. 21, 2026).

[71] Ericsson Router 6273 Datasheet, Rev T (2024), *supra*.

92. *Which are configured so that at least one interface of at least one of the switches is configured as a first type of the interfaces, and a plurality of other interfaces are configured as a second type of the interfaces.* The interfaces of an H-VPLS bridge domain on the Router 6273 are configured in two classes that the governing standard forwards differently: the spoke connection to a multi-tenant unit, which may forward to any other interface of the instance, and the hub pseudowires to the other provider-edge devices, which may not forward to one another. The standard provides that "a PE MUST NOT forward traffic from one PW to another in the same VPLS mesh," while "the PE-rs will switch traffic between the spoke PW, hub PWs, and ACs once it has learned the MAC addresses."[72] The spoke connection is therefore an interface of the first type, and the plurality of hub pseudowires are interfaces of the second type, within the meaning of claim 11. The claim defines the two types by the forwarding treatment each receives, not by name, and it does not require that Ericsson or the standard use the patentee's labels for them. In the alternative E-Tree ground, the two classes are root and leaf attachment circuits: "On the ingress PE, the PE needs to place all its Leaf ACs for a given bridge domain in a single split-horizon group in order to prevent intra-PE forwarding among its Leaf ACs."[73] Ericsson's own patent describes the same two classes: "E-tree is an Ethernet service defined by Metro Ethernet Forum (MEF) as a particular rooted multipoint form of an Ethernet Local Area Network (LAN) service. In an e-tree

---

[72] IETF RFC 4762, Virtual Private LAN Service (VPLS) Using Label Distribution Protocol (LDP) Signaling §§ 4.4 and 10.1.1.2 (Jan. 2007), https://www.rfc-editor.org/rfc/rfc4762.txt (last visited Sept. 21, 2026); *see also id.* § 10 ("A Hierarchical VPLS Model").

[73] IETF RFC 8317, Ethernet-Tree (E-Tree) Support in Ethernet VPN (EVPN) and Provider Backbone Bridging EVPN (PBB-EVPN) § 4.2 (Jan. 2018), https://www.rfc-editor.org/rfc/rfc8317.txt (last visited Sept. 21, 2026).

service network, there are two types of network nodes: (1) root nodes; and (2) leaf nodes," and it describes a provider edge with "one root access circuit (AC) RAC1" and "one leaf AC LAC1."[74]

93. *A frame processor, which is operative.* The forwarding engine of the Router 6273, merchant silicon operating under IPOS with "800Gbps switching capacity," is the frame processor that performs the learning, lookup, comparison, labeling and forwarding operations described below.[75] The '303 Patent confirms that the frame processor need not be a distinct physical device: the processing channels "may rather be implemented as threads or process carried out by a processing device that serves multiple ports." '303 Patent at 6:66-7:3.

94. *To create an entry comprising a source address of the frame and a number equal to a type indication of the frame to identify the first interface.* On information and belief, when the Router 6273 learns a source address in an H-VPLS bridge domain it creates a forwarding-database entry holding that address together with a value identifying the class of the interface or pseudowire on which the frame entered. The standard that Ericsson names requires each provider edge to learn source addresses: "A particular PE must be able to learn the MAC addresses from the CEs that are connected to it. This is referred to as local learning. The PEs in a particular EVPN instance MUST support local data-plane learning using standard IEEE Ethernet learning procedures."[76] An independent laboratory tested the Router 6273 as a provider edge in its EVPN MAC-mobility test.[77] Ericsson's own patents describe learning that records the class of the ingress interface with

[74]U.S. Patent No. 8,619,635 B2 (assigned to Telefonaktiebolaget LM Ericsson), at 1:21-25, 5:38-42, https://patents.google.com/patent/US8619635B2/en (last visited Sept. 21, 2026).

[75] Ericsson Router 6273 Datasheet, Rev T (2024), *supra*.

[76] IETF RFC 7432, BGP MPLS-Based Ethernet VPN § 9.1 (Feb. 2015), https://www.rfc-editor.org/rfc/rfc7432.txt (last visited Sept. 21, 2026).

[77] EANTC, Multi-Vendor MPLS SDN Interoperability Test Report 2023, at 12, https://eantc.de/wp-content/uploads/2023/04/EANTC-InteropTest2023-TestReport.pdf (last visited Sept. 21, 2026).

the learned address: the network element "associates the source MAC address with the logical port associated with the root PW in a root PW MAC address table, and also associates the source MAC address with the logical port associated with the leaf PW in a leaf PW MAC address table,"[78] and "[t]he set of associations in the MAC address table 132 includes an attribute to indicate whether a particular MAC address was learned from a PW and a type of that PW, where the PW type is either a root PW or a leaf PW."[79] The basis for Plaintiff's belief is the mandatory learning requirement of the standard quoted above, the forwarding rules of the H-VPLS and E-Tree services, which turn on the class of the interface on which a frame arrives, and Ericsson's own patents, which record that class with the learned address.

95. *And to add the entry to a forwarding database containing an identification of at least a second interface through which the frame should be forwarded and a type designation of the destination address as being associated with the first or second type of the interfaces.* On information and belief, the Router 6273 adds each learned entry to the forwarding database of the bridge domain, which holds for every known destination address an egress interface and a designation of the class of interface with which that address is associated. In H-VPLS, "the PE-rs will switch traffic between the spoke PW, hub PWs, and ACs once it has learned the MAC addresses."[80] In the alternative E-Tree ground, the standard describes the same forwarding-database content: "on the ingress PE, the MAC destination address lookup yields (in addition to the forwarding adjacency) a flag that indicates whether or not the target MAC is associated with a

---

[78]U.S. Patent No. 8,537,810 B2 (assigned to Telefonaktiebolaget LM Ericsson), at 2:10-18, https://patents.google.com/patent/US8537810B2/en (last visited Sept. 21, 2026).

[79]U.S. Patent No. 8,619,635 B2 (assigned to Telefonaktiebolaget LM Ericsson), at 6:25-60, https://patents.google.com/patent/US8619635B2/en (last visited Sept. 21, 2026).

[80] IETF RFC 4762, Virtual Private LAN Service (VPLS) Using Label Distribution Protocol (LDP) Signaling § 10.1.1.2 (Jan. 2007), https://www.rfc-editor.org/rfc/rfc4762.txt (last visited Sept. 21, 2026).

Leaf site,"[81] and Ericsson's own patent describes a MAC address table that stores, for each learned address, the egress logical port and a root-or-leaf type attribute.[82] The basis for Plaintiff's belief is that, under the standards quoted above, each destination in an H-VPLS instance is reached through a hub pseudowire, a spoke pseudowire or an attachment circuit, each provisioned in a known class, and that the E-Tree standard describes a destination lookup that returns the leaf flag together with the forwarding adjacency.

96. *Upon receiving through a first interface of a given switch a frame comprising a given destination address, to look up the destination address in the forwarding database.* A VPLS or Ethernet VPN E-LAN bridge on the Router 6273 forwards a known-unicast frame by looking up its destination MAC address in the forwarding database. That is what an E-LAN service is. "PEs forward packets that they receive based on the destination MAC address."[83] Ericsson describes the same operation in its own patent: "The C-DA of the received frames is used to inquire the I-Component's Filtering Database and identify the set of ports that the frame is to be forwarded to."[84]

97. *And to compare the type designation with a type indication of the frame in order to determine whether to forward the frame through the second interface.* On information and belief, the Router 6273 compares the stored class designation of the destination address with the class of

---

[81] IETF RFC 8317, Ethernet-Tree (E-Tree) Support in Ethernet VPN (EVPN) and Provider Backbone Bridging EVPN (PBB-EVPN) § 4.1 (Jan. 2018), https://www.rfc-editor.org/rfc/rfc8317.txt (last visited Sept. 21, 2026).

[82] U.S. Patent No. 8,619,635 B2 (assigned to Telefonaktiebolaget LM Ericsson), at 6:25-60, https://patents.google.com/patent/US8619635B2/en (last visited Sept. 21, 2026).

[83] IETF RFC 7432, BGP MPLS-Based Ethernet VPN § 9 (Feb. 2015), https://www.rfc-editor.org/rfc/rfc7432.txt (last visited Sept. 21, 2026).

[84] U.S. Patent No. 8,594,088 B2 (assigned to Telefonaktiebolaget LM Ericsson), https://patents.google.com/patent/US8594088B2/en (last visited Sept. 21, 2026).

the interface on which the frame arrived in order to determine whether to forward the frame through the egress interface. The split-horizon rule of H-VPLS requires the switch to withhold a frame carried on a hub pseudowire from every other hub pseudowire: "a PE MUST NOT forward traffic from one PW to another in the same VPLS mesh."[85] In the alternative E-Tree ground, the standard describes the same comparison: "The ingress PE cross-checks this flag with the status of the originating AC, and if both are Leafs, then the packet is not forwarded,"[86] and Ericsson's own patents describe it: when "an attribute associated with that MAC address in the MAC address table indicates the MAC address was learned from the leaf PW, the edge network element drops the packet,"[87] and "the forwarding module 133 discards that packet if that packet's destination MAC address is found in the root PW MAC address table 132 but not in the leaf PW MAC address table 134."[88] The basis for Plaintiff's belief is the mandatory split-horizon rule of H-VPLS and the E-Tree cross-check, each quoted above, and Ericsson's own patents, which describe the same comparison.

98. *Upon receiving frames through the interfaces of the first and second types for transmission over the network, to label the received frames with corresponding first and second type indications.* On information and belief, the Router 6273 labels frames received through the interfaces of the first and second types with corresponding indications when it encapsulates them

---

[85] IETF RFC 4762, Virtual Private LAN Service (VPLS) Using Label Distribution Protocol (LDP) Signaling § 4.4 (Jan. 2007), https://www.rfc-editor.org/rfc/rfc4762.txt (last visited Sept. 21, 2026).

[86] IETF RFC 8317, Ethernet-Tree (E-Tree) Support in Ethernet VPN (EVPN) and Provider Backbone Bridging EVPN (PBB-EVPN) § 4.1 (Jan. 2018), https://www.rfc-editor.org/rfc/rfc8317.txt (last visited Sept. 21, 2026).

[87] U.S. Patent No. 8,619,635 B2 (assigned to Telefonaktiebolaget LM Ericsson), at 2:5-14, https://patents.google.com/patent/US8619635B2/en (last visited Sept. 21, 2026).

[88] U.S. Patent No. 8,537,810 B2 (assigned to Telefonaktiebolaget LM Ericsson), at 8:14-20, https://patents.google.com/patent/US8537810B2/en (last visited Sept. 21, 2026).

for transmission across the bridged network. In H-VPLS every hub pseudowire and every spoke pseudowire carries its own label, so that the label with which a frame is encapsulated identifies the class of the pseudowire that carries it. In the alternative E-Tree ground, the standard requires the labeling expressly: "the MPLS-encapsulated frames MUST be tagged with an indication of when they originated from a Leaf AC (i.e., to be tagged with a Leaf label as specified in Section 6.1)."[89] Ericsson's own patent marks each frame by origin type through the pseudowire that carries it: "a root PW is used for carrying packets that are sent from a root node network element, and a leaf PW is used for carrying packets that are sent from a leaf node network element in the e-tree service network."[90] The '303 Patent provides that "[a]ny suitable type indication may be used to mark the frame . . . as long as the other nodes in network 20 are programmed to recognize the indication," and names "one of the bits of the inner pseudo-wire (PW) label" as one. '303 Patent at 8:31-41.

99. *And to cause the interfaces to forward the frames through the Layer-2 bridged network responsively to the type indications.* On information and belief, the receiving Router 6273 forwards the frame according to the indication it carries. In H-VPLS, a frame received over a hub pseudowire is delivered only to attachment circuits and spoke pseudowires and is never sent to another hub pseudowire, whereas a frame received over a spoke pseudowire is forwarded to every other interface of the instance.[91] In the alternative E-Tree ground: "When a PE receives this special Leaf label in the data path, it blocks the packet if the destination AC is of type Leaf; otherwise, it

[89] IETF RFC 8317, Ethernet-Tree (E-Tree) Support in Ethernet VPN (EVPN) and Provider Backbone Bridging EVPN (PBB-EVPN) § 4.2 (Jan. 2018), https://www.rfc-editor.org/rfc/rfc8317.txt (last visited Sept. 21, 2026).

[90] U.S. Patent No. 8,619,635 B2 (assigned to Telefonaktiebolaget LM Ericsson), Abstract, https://patents.google.com/patent/US8619635B2/en (last visited Sept. 21, 2026).

[91] IETF RFC 4762, Virtual Private LAN Service (VPLS) Using Label Distribution Protocol (LDP) Signaling §§ 4.4 and 10.1.1.2 (Jan. 2007), https://www.rfc-editor.org/rfc/rfc4762.txt (last visited Sept. 21, 2026).

forwards the packet."[92] The service label demultiplexes the frame to the bridged instance and to the pseudowire or segment class that carried it, and the interfaces of the node then forward it through the Layer-2 bridged network responsively to that type indication.

100. *By permitting the frames that are labeled with the first type indication to be transmitted through any of the interfaces.* Frames arriving on a spoke connection or an attachment circuit are switched to the spoke pseudowire, the hub pseudowires and the attachment circuits of the bridge domain: "The operation of PE-rs is independent of the type of device at the other end of the spoke. Thus, the spoke from the MTU-s is treated as a virtual port, and the PE-rs will switch traffic between the spoke PW, hub PWs, and ACs once it has learned the MAC addresses."[93] In the alternative E-Tree ground, root-originated frames are not restricted: "the ingress PE does not add any ESI or Leaf labels and it operates per the procedures in [RFC7432],"[94] and, as an independent laboratory states the rule, "Root sites can communicate with all other sites."[95]

101. *While permitting the frames that are labeled with the second type indication to be transmitted through the interfaces of the first type and preventing the frames that are labeled with the second type indication from being transmitted through the interfaces of the second type.* Frames arriving on a hub pseudowire are switched to the spoke connection and to the attachment circuits

---

92 IETF RFC 8317, Ethernet-Tree (E-Tree) Support in Ethernet VPN (EVPN) and Provider Backbone Bridging EVPN (PBB-EVPN) § 4.2.1 (Jan. 2018), https://www.rfc-editor.org/rfc/rfc8317.txt (last visited Sept. 21, 2026).

93 IETF RFC 4762, Virtual Private LAN Service (VPLS) Using Label Distribution Protocol (LDP) Signaling § 10.1.1.2 (Jan. 2007), https://www.rfc-editor.org/rfc/rfc4762.txt (last visited Sept. 21, 2026).

94 IETF RFC 8317, Ethernet-Tree (E-Tree) Support in Ethernet VPN (EVPN) and Provider Backbone Bridging EVPN (PBB-EVPN) § 4.2.2 (Jan. 2018), https://www.rfc-editor.org/rfc/rfc8317.txt (last visited Sept. 21, 2026).

95 EANTC, MPLS + SDN + NFV World Congress 2019 Multi-Vendor Interoperability Test, White Paper v1.3, at 6, https://eantc.de/wp-content/uploads/2023/04/EANTC-MPLSSDNNFV2019-WhitePaper-v1.3.pdf (last visited Sept. 21, 2026).

and are not forwarded to another pseudowire in the same mesh, under "the 'split horizon' rule, whereby a PE MUST NOT forward traffic from one PW to another in the same VPLS mesh."[96] In the alternative E-Tree ground, "Leaf sites can communicate with Root sites but not with other Leaf sites";[97] the standard blocks the packet "if the destination AC is of type Leaf; otherwise, it forwards the packet";[98] and Ericsson's own patent describes the drop: "packets from a local leaf node received in one edge network element destined for a remote leaf node attached to another edge network element are locally discarded."[99] Frames labeled with the second type indication are accordingly permitted to be transmitted through interfaces of the first type and prevented from being transmitted through interfaces of the second type.

102. *And to update the forwarding database using a database learning process responsively to the source address and to the type indication of the frame.* On information and belief, the Router 6273 updates the forwarding database of the bridge domain by a learning process that responds both to the source address of the frame and to the class of the interface on which the frame arrived. Learning in the service is performed per bridge domain across attachment circuits and both classes of pseudowire,[100] and "[t]he PEs in a particular EVPN instance MUST support

---

[96] IETF RFC 4762, Virtual Private LAN Service (VPLS) Using Label Distribution Protocol (LDP) Signaling § 4.4 (Jan. 2007), https://www.rfc-editor.org/rfc/rfc4762.txt (last visited Sept. 21, 2026).

[97] EANTC, MPLS + SDN + NFV World Congress 2019 Multi-Vendor Interoperability Test, White Paper v1.3, at 6, https://eantc.de/wp-content/uploads/2023/04/EANTC-MPLSSDNNFV2019-WhitePaper-v1.3.pdf (last visited Sept. 21, 2026).

[98] IETF RFC 8317, Ethernet-Tree (E-Tree) Support in Ethernet VPN (EVPN) and Provider Backbone Bridging EVPN (PBB-EVPN) § 4.2.1 (Jan. 2018), https://www.rfc-editor.org/rfc/rfc8317.txt (last visited Sept. 21, 2026).

[99]U.S. Patent No. 8,537,810 B2 (assigned to Telefonaktiebolaget LM Ericsson), at 8:28-33, https://patents.google.com/patent/US8537810B2/en (last visited Sept. 21, 2026).

[100] IETF RFC 4762, Virtual Private LAN Service (VPLS) Using Label Distribution Protocol (LDP) Signaling § 10.1.1.2 (Jan. 2007), https://www.rfc-editor.org/rfc/rfc4762.txt (last visited Sept. 21, 2026).

local data-plane learning using standard IEEE Ethernet learning procedures."[101] An independent laboratory observed the Router 6273 as a provider edge in a MAC-mobility test and "verified that once the MAC address was transferred to a new DUT, the sequence number was increased by 1, and the RT-2 update was sent out. All other DUTs had their route table updated accordingly."[102] Ericsson's own patent describes a learning process that "associates the source MAC address with the logical port associated with the root PW in a root PW MAC address table, and also associates the source MAC address with the logical port associated with the leaf PW in a leaf PW MAC address table."[103] The basis for Plaintiff's belief is that learning in a VPLS instance associates each source address with the pseudowire or attachment circuit on which the frame arrived, each of which is provisioned in a known class.

103. The Router 6274, Router 6371, Router 6471, Router 6672, Router 6673, Router 6675 and Router 6678 run the same IPOS software and, according to Ericsson's datasheets, implement the same VPLS/H-VPLS features, and each of them meets every limitation of claim 11 in the same manner as the Router 6273 when coupled together in an H-VPLS bridge domain. Each of those models also lists Ethernet VPN services or "EVPN" among its features and, on information and belief, meets every limitation of claim 11 on the alternative E-Tree ground.

104. Ericsson makes the apparatus of claim 11 when its own personnel install, configure and couple together the Accused Instrumentalities in H-VPLS or Ethernet VPN bridge domains for a customer in the United States, through the "product configuration and integration

---

[101] IETF RFC 7432, BGP MPLS-Based Ethernet VPN § 9.1 (Feb. 2015), https://www.rfc-editor.org/rfc/rfc7432.txt (last visited Sept. 21, 2026).

[102] EANTC, Multi-Vendor MPLS SDN Interoperability Test Report 2023, at 11-12, https://eantc.de/wp-content/uploads/2023/04/EANTC-InteropTest2023-TestReport.pdf (last visited Sept. 21, 2026).

[103] U.S. Patent No. 8,537,810 B2 (assigned to Telefonaktiebolaget LM Ericsson), at 2:10-18, https://patents.google.com/patent/US8537810B2/en (last visited Sept. 21, 2026).

capabilities" that "cover end-to-end deployments from site acquisition to customer acceptance."[104] Ericsson uses the apparatus of claim 11 when it operates a customer's transport network built from the Accused Instrumentalities under a managed services agreement.[105] Ericsson makes and uses the apparatus of claim 11 when it builds and operates groups of the Accused Instrumentalities in such bridge domains in its own facilities in the United States for development, testing, demonstration and customer trial. Ericsson sells, offers to sell and imports the apparatus of claim 11 when it sells, offers to sell and imports groups of the Accused Instrumentalities together with the IPOS software that configures them as H-VPLS and Ethernet VPN provider-edge switches and the deployment and integration services by which Ericsson itself couples them together. On information and belief, LM Ericsson manufactures, or has manufactured, the Accused Instrumentalities and the IPOS software and supplies them for importation into and sale in the United States, and Ericsson USA imports, sells, offers to sell, installs and operates them in the United States, including in this District.

105. Each communications service provider that owns and operates a network built from the Accused Instrumentalities coupled together in an H-VPLS or Ethernet VPN bridge domain makes and uses the apparatus of claim 11 and directly infringes the '303 Patent.

106. Ericsson has induced and continues to induce the infringement of at least claim 11 of the '303 Patent by its customers and other third parties in violation of 35 U.S.C. § 271(b). Ericsson has known of the '303 Patent and of the infringing nature of the Accused Instrumentalities at least since the date of service of this Complaint, and, on information and belief, since its

---

[104] Ericsson, Network Deployment, https://www.ericsson.com/en/portfolio/networks/network-services/network-deployment (last visited Sept. 21, 2026).

[105] Ericsson, Managed Network Services, https://www.ericsson.com/en/managed-services (last visited Sept. 21, 2026).

engagement with Orckit-Corrigent in 2011 and 2012, as alleged in Section VI above. With that knowledge, and with the specific intent that its customers make and use the Accused Instrumentalities in the infringing arrangement, Ericsson has taken and continues to take active steps to encourage and facilitate that infringement, including by: designing IPOS to implement H-VPLS and Ethernet VPN E-LAN and E-Tree services and marketing those features as released capabilities of the Accused Instrumentalities; publishing datasheets, brochures and technical literature that instruct customers to deploy the Accused Instrumentalities as provider-edge switches in those services; supplying customers with IPOS instruction manuals and configuration guides through its customer Extranet; installing, configuring and coupling the Accused Instrumentalities for customers through its Network Deployment services; provisioning customers' routers through ENM auto-integration; training customers' and partners' personnel in "deployment and network integration" at its Training Center of Excellence in Lewisville, Texas and elsewhere; and providing technical support, software updates and managed services for the deployed networks. Ericsson knows, or is willfully blind to the fact, that the use of the Accused Instrumentalities in the manner it instructs infringes the '303 Patent, and its customers have directly infringed and continue to directly infringe as a result.

107. Ericsson has contributorily infringed and continues to contributorily infringe at least claim 11 of the '303 Patent in violation of 35 U.S.C. § 271(c) by selling, offering to sell and importing into the United States the Accused Instrumentalities, including the Router 6000 Series routers and the IPOS software that implements H-VPLS hub-and-spoke forwarding and Ethernet VPN E-Tree forwarding, knowing that those components constitute a material part of the invention of claim 11, that they are especially made and especially adapted for use in an infringing manner, and that they are not staple articles or commodities of commerce suitable for substantial non-

infringing use. On information and belief, the H-VPLS hub-and-spoke forwarding and E-Tree forwarding functions of IPOS have no substantial non-infringing use: each exists only to apply different forwarding treatment to two classes of interface within a bridged instance, which is the arrangement claim 11 recites, and the Accused Instrumentalities are sold to communications service providers for deployment in exactly those arrangements; and Ericsson has known of the ’303 Patent since at least the service of this Complaint and, on information and belief, since 2011 and 2012.

108. In the alternative, since at least its engagement with Orckit-Corrigent in 2011 and 2012, and in any event since the service of this Complaint, Ericsson has subjectively believed that there was a high probability that the Accused Instrumentalities, and their use in the manner Ericsson instructs, infringe the ’303 Patent, and has taken deliberate actions to avoid confirming that fact.

109. Ericsson’s infringement of the ’303 Patent has been and continues to be willful. Ericsson has known of Orckit-Corrigent and of the technology claimed in the ’303 Patent since 2011, when it conducted diligence on Orckit-Corrigent, approved a joint architecture, tested a joint solution and sought to integrate it into its own platform, and then proceeded with its own development, and, on information and belief, Ericsson knew of, or was willfully blind to, the ’303 Patent from that time. Since at least the service of this Complaint, Ericsson has had actual knowledge of the ’303 Patent and of its infringement, and, on information and belief, has continued to make, use, sell, offer for sale and import the Accused Instrumentalities and to induce and contribute to their infringing use, without a license and without any good-faith basis to believe that it does not infringe or that the ’303 Patent is invalid. Ericsson’s deliberate and intentional

infringement warrants enhanced damages under 35 U.S.C. § 284 and renders this an exceptional case under 35 U.S.C. § 285.

110. Plaintiff has suffered and continues to suffer damages as a result of Ericsson's infringement of the '303 Patent. Ericsson is liable to Plaintiff under 35 U.S.C. § 284 for damages in an amount adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by Ericsson, together with interest and costs. Ericsson's infringement has caused and will continue to cause Plaintiff irreparable injury for which there is no adequate remedy at law unless Ericsson is enjoined by this Court.

**COUNT III**
**INFRINGEMENT OF U.S. PATENT NO. 7,808,931**

111. Plaintiff realleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint.

112. Ericsson has directly infringed and continues to directly infringe at least claim 29 of the '931 Patent, literally or under the doctrine of equivalents, in violation of 35 U.S.C. § 271(a), by making, using, selling, offering for sale and importing into the United States, without authority, the Accused Instrumentalities identified above for the '931 Patent, including the Ericsson Router 6273, Router 6274, Router 6371, Router 6471, Router 6672, Router 6673 and Router 6675 running IPOS.

113. Claim 29 of the '931 Patent recites:

> 29. A ring node for use in a communication network that includes at least three communication rings in a concentric layout, each including two unidirectional ringlets oriented in mutually-opposite directions, the ring node connected to at least three of the communication rings all of which are connected to a second node, the ring node comprising: at least three line cards, which are arranged to communicate with the respective at least three communication rings; and a network processor, which is arranged to accept a data packet comprising one or more header fields, to

> determine an egress ring node to which the data packet is to be forwarded, to identify a subset of the concentric rings comprising one or more common rings that are connected to both the ring node and the egress ring node, to select, responsively to a respective value of at least one of the header fields of the data packet, a ringlet of a ring among the one or more common rings, and to forward the data packet to the egress ring node over the selected ringlet.

114. Claim 29 is a claim to a single device, a ring node. Each Accused Instrumentality, as made, sold, offered for sale and imported by Ericsson with the IPOS software that carries out the recited functions, is such a ring node. The following paragraphs describe how the Ericsson Router 6273 running IPOS meets every limitation of claim 29. The Router 6273 is representative. The parallel rings of the claimed network may be the member links of the link aggregation groups that form the ring links of one Ethernet ring, or separate Ethernet rings that run through the same ring nodes over separate fibers or wavelengths; Plaintiff pleads both in the alternative. By describing the preamble, Plaintiff does not concede that the preamble is limiting.

115. *A ring node for use in a communication network.* The Router 6273 is a ring node for use in a communication network. Ericsson's datasheet lists "G.8032 Ethernet Ring Protection Switching" among its released features, and G.8032 exists to operate Ethernet rings.[106] Ericsson's own patent describes the protocol: "[a] G.8032 Ethernet protection ring has one ring protection link (RPL) which is blocked in normal operation, thus avoiding loops."[107]

116. *That includes at least three communication rings in a concentric layout.* The '931 Patent uses "concentric" for rings that run in parallel through the same ring nodes, as rings 28A, 28B and 28C do in its Figure 1: "nodes 24A and 24E are connected to all three rings 28A . . . 28C." '931 Patent at 5:28-29. Such rings may share one physical medium: "all segments connecting a

---

[106] Ericsson Router 6273 Datasheet, Rev T (2024), *supra*.

[107] U.S. Patent No. 9,699,021 B2 (assigned to Telefonaktiebolaget LM Ericsson), at 1:29-31, https://patents.google.com/patent/US9699021B2/en (last visited Sept. 21, 2026).

pair of neighboring ring nodes use a single fiber-optic connection as the physical communication medium. The different rings and ringlets are multiplexed onto the fiber-optic connection, such as using wavelength division multiplexing (WDM)." *Id.* at 5:20-26. The patent describes the arrangement as "link aggregation over multiple rings," *id.* at 1:6-9, in which "the set of possible rings is referred to as a LAG group, and each ring in the group is referred to as a member," *id.* at 9:26-29, and it explains the point of the arrangement: "if each ring 28 comprises a 10 Gbps RPR, network 20 as a whole can provide a total bandwidth of 30 Gbps." *Id.* at 5:9-11. During prosecution, the applicant distinguished rings whose extrapolated circles have centers that are "displaced in position."[108] An Ethernet ring whose ring links are IEEE 802.3ad link aggregation groups is a network of parallel rings in that sense. A link aggregation group joins "a group of parallel physical links between two endpoints," *id.* at 1:31-34, and each member link of the group, followed from node to node around the ring, closes its own physical ring through the same nodes, so that a ring built on aggregation groups of three members comprises three communication rings in a concentric layout. Ericsson's datasheet lists both "IEEE 802.3ad Link Aggregation Control Protocol" and "G.8032 Ethernet Ring Protection Switching" among the Router 6273's released features,[109] and Ethernet ring protection is run over ring links that are link aggregation groups as a matter of ordinary industry practice.[110] The Router 6273 is a modular chassis that "sets a new

[108] '931 Patent File History, Amendment and Response to Office Action of January 12, 2010 (U.S. Application No. 11/367,231), Remarks (arguing that the rings of the Clauberg reference, whose extrapolated circles have centers "displaced in position," "cannot be concentric," and that "nowhere does Clauberg illustrate or otherwise disclose rings in a concentric configuration or layout").

[109] Ericsson Router 6273 Datasheet, Rev F (2019), at 2; Rev T (2024), at 2.

[110] See, e.g., Nokia, *G.8032 Ethernet Ring Protection Single Ring Topology*, Services Overview Guide (ring links "configured on ports or link aggregation groups (LAGs)"), https://documentation.nokia.com/acg/23-7-2/books/classic-cli-part-ii/c028-g8032-singlering.html (last visited Sept. 22, 2026).

benchmark for port density and footprint by scaling up to 12x100G interfaces and offering up to 800Gbps switching capacity in a space efficient 3RU chassis."[111] On information and belief, Ericsson and its customers deploy the Router 6273 in Ethernet rings whose ring links are link aggregation groups of at least three member links and, in the alternative, in at least three parallel Ethernet rings that run through the same set of ring nodes over separate fibers or wavelengths, and in either case the Router 6273 is a ring node of a network that includes at least three communication rings in a concentric layout. The basis for that belief is that Ericsson publishes both link aggregation and ring protection as released features of the Router 6273; that link aggregation exists to carry more traffic between two nodes than one physical link can, which is the need of a metro aggregation ring as traffic grows; that the Router 6273 is sold with line cards of 10-, 25- and 100-gigabit ports, so that ring capacity is scaled by aggregating members; and that Ericsson designs, installs and integrates these networks for operators.

117. *Each including two unidirectional ringlets oriented in mutually-opposite directions.* Each Ethernet ring runs over full-duplex ring links and carries traffic in both rotations at once, and each member link of a link aggregation group is itself a full-duplex Ethernet link, so that each of the parallel rings carries traffic in both directions: "Each Ethernet ring node is connected to adjacent Ethernet ring nodes participating in the same Ethernet ring, using two independent links. A ring link is bounded by two adjacent Ethernet ring nodes and a port for a ring link is called a ring port,"[112] and "the ETH characteristic information (ETH_CI [ITU-T G.8010]) traffic may be transferred over both ring links of any Ethernet ring node, except for the RPL on

[111] Ericsson Router 6273 Datasheet, Rev T (2024), *supra*.

[112] ITU-T Recommendation G.8032/Y.1344 (03/2020), Ethernet ring protection switching, cl. 6, https://www.itu.int/rec/dologin_pub.asp?lang=e&id=T-REC-G.8032-202003-I!!PDF-E&type=items (last visited Sept. 21, 2026).

the Ethernet ring nodes where the RPL is blocked."[113] Each direction of transmission around the ring is a unidirectional ringlet, and the two are oriented in mutually opposite directions. The '931 Patent describes each ring as comprising "two unidirectional ringlets oriented in mutually-opposite directions," '931 Patent at 5:15-16, and treats a ringlet and a direction as the same thing: "the ringlet (or, equivalently, the east or west direction)." *Id.* at 10:3-5.

118. *The ring node connected to at least three of the communication rings all of which are connected to a second node.* A link aggregation group is formed between two endpoints: it joins "a group of parallel physical links between two endpoints in a data network," and traffic is "distributed among the physical links in a manner that is transparent to the clients that send and receive the traffic." '931 Patent at 1:31-36. On information and belief, a Router 6273 whose ring links are aggregation groups of at least three members is connected, through the members of its east-facing group and the members of its west-facing group, to at least three of the communication rings, and each of those rings is connected to a second node: the adjacent ring node at the far end of each group, and every other node around the ring. The basis for that belief is that under IEEE 802.3ad every member of an aggregation group terminates on the same pair of nodes, so that each member ring that passes through the Router 6273 also passes through its neighbors, and that Ericsson publishes link aggregation and ring protection as features of every Router 6000 Series model, so that the neighboring nodes carry the member rings onward around the ring. The '931 Patent defines "connected" by packet processing rather than by physical attachment: "The term 'connected' is used herein to describe a certain amount of packet processing performed by the

[113] ITU-T Recommendation G.8032/Y.1344 (03/2020), Ethernet ring protection switching, cl. 9.3, https://www.itu.int/rec/dologin_pub.asp?lang=e&id=T-REC-G.8032-202003-I!!PDF-E&type=items (last visited Sept. 21, 2026).

node on the packets carried by the ring and is not meant to describe a mere physical connection." *Id.* at 5:43-46.

119. *The ring node comprising at least three line cards.* Ericsson's datasheet states that the Router 6273 takes "[u]p to 7 Line card slots (6 LC slots for AC) that can take the following line card types -LC 2x100GE QSFP28 -LC 8x10GE/25GE SFP28 -LC 8xGE/10GE SFP+."[114] The Router 6673, another Accused Instrumentality, has "[u]p to 3 Line card slots that can take the following line card types -LC 2x100GE QSFP28, LC 8x10GE/25GE SFP28, LC 8xGE/10GE SFP+, LC 9xCPRI SFP+," and "shares the same platform with Router 6273 where the line cards, power modules and fan tray of Router 6273 can be used in Router 6673."[115] On information and belief, Router 6273 units are sold and deployed with at least three line cards installed. The basis for that belief is the datasheet quoted above, which offers the Router 6273 with up to seven line card slots and with line cards of as few as two ports, so that a Router 6273 whose east and west ring links are aggregation groups of three 100-gigabit members has six ring-facing 100-gigabit ports and uses at least three line cards to provide them.

120. *Which are arranged to communicate with the respective at least three communication rings.* The ring ports of each ring are Ethernet interfaces on the Router 6273's line cards: "a port for a ring link is called a ring port."[116] The '931 Patent's own node assigns each ring to its own line-card unit, "units 38A . . . 38C are assigned to rings 28A . . . 28C, respectively," '931 Patent at 6:5-7, and treats the division of ring-facing hardware among cards as a matter of

---

[114] Ericsson Router 6273 Datasheet, Rev T (2024), *supra*.

[115] Ericsson Router 6673 Datasheet, 1/287 01-FGC 101 3863 Uen Rev F (2024), https://www.ericsson.com/495bd2/assets/global/eridoc/2152827/1-28701-FGC1013863UEN.pdf (last visited Sept. 21, 2026).

[116] ITU-T Recommendation G.8032/Y.1344 (03/2020), Ethernet ring protection switching, cl. 6, https://www.itu.int/rec/dologin_pub.asp?lang=e&id=T-REC-G.8032-202003-I!!PDF-E&type=items (last visited Sept. 21, 2026).

implementation. *Id.* at 6:11-12, 6:38-40. On information and belief, where the Router 6273's ring links are aggregation groups of three or more members, the member ports of the respective rings are carried on at least three line cards, each of which is thereby arranged, through port assignment and aggregation-group configuration, to communicate with a respective ring. The basis for that belief is that a Router 6273 with six 100-gigabit member ports on two-port line cards carries those ports on at least three cards, and that, however the ports of the three rings are distributed among those cards, each card carries a port of at least one of the rings and the three cards together communicate with the three respective rings.

121. *A network processor, which is arranged.* The forwarding engine of the Router 6273, merchant silicon with "800Gbps switching capacity," is the network processor that makes the forwarding decisions described below.[117] Ericsson states that it "is developing a complete router portfolio that implements SRv6 natively without any performance degradations using the latest generation merchant ASIC chipsets for cell site, pre-aggregation, aggregation, DC gateway and Cloud RAN use cases."[118] The '931 Patent uses the term broadly: "a packet processor, such as a network processor (NP)." '931 Patent at 6:53-54.

122. *To accept a data packet comprising one or more header fields.* The Router 6273 accepts Ethernet, IP and MPLS packets, each of which carries header fields, including destination and source MAC addresses and VLAN tags, in delivering the "802.1Q virtual LAN (VLAN)," "802.1ad Provider Bridge," "L3 MPLS VPNs" and "VPLS/H-VPLS" services its datasheet lists.[119]

---

[117] Ericsson Router 6273 Datasheet, Rev T (2024), *supra*.

[118] Ericsson steps up efforts to reduce complexity in transport networks (June 1, 2023), https://www.ericsson.com/en/news/2023/5/ericsson-steps-up-efforts-to-reduce-complexity-in-transport-networks (last visited Sept. 21, 2026).

[119] Ericsson Router 6273 Datasheet, Rev T (2024), *supra*.

123. *To determine an egress ring node to which the data packet is to be forwarded.* The Router 6273 resolves the destination carried in the packet to the node through which that destination is reached. In an Ethernet ring, the forwarding database of the bridge maps the destination MAC address to the ring port through which the egress node is reached; in an IP or MPLS ring, the routing table maps the destination address or label to the next-hop node. "PEs forward packets that they receive based on the destination MAC address."[120] G.8032 rests on "the utilization of learning, forwarding and filtering database (FDB) mechanisms defined in the Ethernet flow forwarding function (ETH_FF [ITU-T G.8021]),"[121] and determination of the destination is inherent in those mechanisms. Ericsson describes the same resolution in its own patent: "The C-DA of the received frames is used to inquire the I-Component's Filtering Database and identify the set of ports that the frame is to be forwarded to."[122]

124. *To identify a subset of the concentric rings comprising one or more common rings that are connected to both the ring node and the egress ring node.* On information and belief, when the Router 6273 forwards a packet toward the egress node over a ring port that is a link aggregation group, it identifies the aggregation group as the set of rings over which the packet may be carried to that node: the members of the group are the rings that connect the Router 6273 with the egress node. The '931 Patent describes the step in exactly those terms: "In IEEE 802.3 LAG terms, the set of possible rings is referred to as a LAG group, and each ring in the group is referred to as a member." '931 Patent at 9:26-29. Ericsson's datasheet lists "IEEE 802.3ad Link Aggregation

---

[120] IETF RFC 7432, BGP MPLS-Based Ethernet VPN § 9 (Feb. 2015), https://www.rfc-editor.org/rfc/rfc7432.txt (last visited Sept. 21, 2026).

[121] ITU-T Recommendation G.8032/Y.1344 (03/2020), Ethernet ring protection switching, cl. 6, https://www.itu.int/rec/dologin_pub.asp?lang=e&id=T-REC-G.8032-202003-I!!PDF-E&type=items (last visited Sept. 21, 2026).

[122] U.S. Patent No. 8,594,088 B2 (assigned to Telefonaktiebolaget LM Ericsson), https://patents.google.com/patent/US8594088B2/en (last visited Sept. 21, 2026).

Control Protocol" and "LFA/RLFA/TI-LFA" among the Router 6273's features.[123] The basis for Plaintiff's belief is that forwarding over an aggregation group resolves the packet to the group before distributing it among the members, as IEEE 802.3ad provides and as Ericsson's own documentation of its link groups describes, and that the members of a ring's aggregation groups are the parallel rings that reach the egress node. In the alternative deployment of separate parallel rings, the Router 6273 identifies the rings on which the destination is reachable, which are the rings that run through both nodes.

125. *To select, responsively to a respective value of at least one of the header fields of the data packet, a ringlet of a ring among the one or more common rings.* On information and belief, the Router 6273 selects the member link, and thereby the ring, by a hash of header fields of the packet, and selects the direction of travel, and thereby the ringlet, by the lookup that resolves the destination address to the east or west ring port. Ericsson documents the first selection in its own configuration guide for the link groups of its routers: "The outgoing traffic load in a dot1q link group or Ethernet link group is distributed stream by stream; that is, using the source and destination MAC addresses of each traffic stream, a hash algorithm assigns streams to circuits in the link group bundle."[124] G.8032 supplies the second: the ring port on which a frame is sent is

[123] Ericsson Router 6273 Datasheet, Rev F (2019), at 2; Rev T (2024), at 2.

[124] Ericsson, *Configuring Link Aggregation*, SmartEdge OS Configuration Guide, Load Balancing, http://rbman.ito.expert/en_lzn7830011_1_r5f/15_1543-CRA1191170_1-V1Uen.H.html (last visited Sept. 22, 2026). The Ericsson IP Operating System that runs the Router 6000 Series is the operating system Ericsson described in 2011 as "deployed in 75 of the top 100 operators networks in the world," Ericsson, *Ericsson introduces SSR 8000 family of Smart Services Routers* (Aug. 31, 2011), https://rcrwireless.com/?p=33560, and extended in 2013 "as the common platform across the entire IP portfolio," Ericsson, *Ericsson strengthens its 4th generation IP portfolio* (Mar. 19, 2013), https://www.ericsson.com/en/press-releases/2013/3/ericsson-strengthens-its-4th-generation-ip-portfolio (each last visited Sept. 22, 2026). On information and belief, IPOS carries forward the link-group implementation Ericsson documented for the SmartEdge OS.

resolved through "the utilization of learning, forwarding and filtering database (FDB) mechanisms defined in the Ethernet flow forwarding function (ETH_FF [ITU-T G.8021])," [125] on the destination MAC address, a header field. Ericsson's datasheet lists "IEEE 802.3ad Link Aggregation Control Protocol." [126] The '931 Patent describes the selection in the same terms: "NP 58 determines the selected member by applying a hashing function to the values of one or more header fields of the packet," naming source and destination MAC addresses, source and destination IP addresses, and transport-layer port numbers, '931 Patent at 9:43-53, so that "hashing these header fields will cause such packets to be forwarded over the same ring 28." *Id.* at 9:53-58. In the alternative deployment of separate parallel rings, the ring is selected by the VLAN tag of the frame, a header field, as the patent likewise contemplates: the path of a packet may be identified "based on packet header values, or based on an association of a connection to which the packet belongs with a specific port or virtual LAN (VLAN)." *Id.* at 9:4-8. The basis for Plaintiff's belief is Ericsson's documentation of its link-group hashing, quoted above; IEEE 802.3ad, under which the frames of a conversation are kept on one member of the group; and the ring-port resolution of G.8032, quoted above.

126. *And to forward the data packet to the egress ring node over the selected ringlet.* On information and belief, the Router 6273 transmits the packet from the selected member port of the ring port's aggregation group, in the selected direction, toward the egress ring node. A frame launched on one ring port of a G.8032 ring travels around the ring in that single rotation, each transit node passing it along its own ring ports until the node addressed as egress receives it, and

---

[125] ITU-T Recommendation G.8032/Y.1344 (03/2020), Ethernet ring protection switching, cl. 6, https://www.itu.int/rec/dologin_pub.asp?lang=e&id=T-REC-G.8032-202003-I!!PDF-E&type=items (last visited Sept. 21, 2026).

[126] Ericsson Router 6273 Datasheet, Rev F (2019), at 2; Rev T (2024), at 2.

G.8032 blocks only the ring protection link: traffic "may be transferred over both ring links of any Ethernet ring node, except for the RPL on the Ethernet ring nodes where the RPL is blocked."[127] Forwarding the packet from the selected port over the ring to the egress ring node is forwarding over the selected ringlet.

127. The Router 6274, Router 6371, Router 6471, Router 6672, Router 6673 and Router 6675 run the same IPOS software and, according to Ericsson's datasheets, implement the same G.8032 Ethernet Ring Protection Switching and IEEE 802.3ad link aggregation features, and each of them meets every limitation of claim 29 in the same manner as the Router 6273.

128. Ericsson makes, uses, sells, offers to sell and imports the ring node of claim 29. Each Accused Instrumentality as made and sold contains the IPOS software that carries out the recited functions, and the claim is met by the product as made and sold. On information and belief, LM Ericsson manufactures, or has manufactured, the Accused Instrumentalities and the IPOS software and supplies them for importation into and sale in the United States, and Ericsson USA imports them into, and sells and offers to sell them in, the United States, including to communications service providers whose networks serve this District. On information and belief, the Accused Instrumentalities are deployed as ring nodes in the networks of communications service providers in the United States. Ericsson also uses the ring node of claim 29 when it installs, configures and integrates the Accused Instrumentalities for customers, when it operates customers' networks built from the Accused Instrumentalities under managed services agreements, and when it operates the Accused Instrumentalities in its own facilities in the United States for development, testing, demonstration and customer trial.

---

[127] ITU-T Recommendation G.8032/Y.1344 (03/2020), Ethernet ring protection switching, cl. 9.3, https://www.itu.int/rec/dologin_pub.asp?lang=e&id=T-REC-G.8032-202003-I!!PDF-E&type=items (last visited Sept. 21, 2026).

129. Each communications service provider that owns and operates a network in which the Accused Instrumentalities are deployed as ring nodes in the arrangement described above uses the ring node of claim 29 and directly infringes the ’931 Patent.

130. Ericsson has induced and continues to induce the infringement of at least claim 29 of the ’931 Patent by its customers and other third parties in violation of 35 U.S.C. § 271(b). Ericsson has known of the ’931 Patent and of the infringing nature of the Accused Instrumentalities at least since the date of service of this Complaint, and, on information and belief, since its engagement with Orckit-Corrigent in 2011 and 2012, as alleged in Section VI above. With that knowledge, and with the specific intent that its customers use the Accused Instrumentalities as ring nodes in the infringing arrangement, Ericsson has taken and continues to take active steps to encourage and facilitate that infringement, including by: designing IPOS to implement G.8032 ring protection, link aggregation and topology-independent loop-free alternate forwarding and marketing those features as released capabilities of the Accused Instrumentalities; publishing datasheets, brochures and technical literature that instruct customers to deploy the Accused Instrumentalities in Ethernet rings with link-aggregated ring links and in parallel rings; supplying customers with IPOS instruction manuals and configuration guides through its customer Extranet; installing, configuring and integrating the Accused Instrumentalities for customers through its Network Deployment services; provisioning customers’ routers through ENM auto-integration; training customers’ and partners’ personnel in “deployment and network integration” at its Training Center of Excellence in Lewisville, Texas and elsewhere; and providing technical support, software updates and managed services for the deployed networks. Ericsson knows, or is willfully blind to the fact, that the use of the Accused Instrumentalities in the manner it instructs

infringes the ’931 Patent, and its customers have directly infringed and continue to directly infringe as a result.

131. Ericsson has contributorily infringed and continues to contributorily infringe at least claim 29 of the ’931 Patent in violation of 35 U.S.C. § 271(c) by selling, offering to sell and importing into the United States the Accused Instrumentalities, including the Router 6000 Series routers, their line cards and the IPOS software that implements G.8032 ring protection and multi-ring forwarding, knowing that those components constitute a material part of the invention of claim 29, that they are especially made and especially adapted for use in an infringing manner, and that they are not staple articles or commodities of commerce suitable for substantial non-infringing use. On information and belief, the ring-protection and link-aggregation functions of IPOS, as combined on the ring ports of a ring node, have no substantial non-infringing use: G.8032 ring protection exists only to operate Ethernet rings, and link aggregation of a ring link exists only to carry the ring over parallel member links, which are parallel rings, as alleged above; and the Accused Instrumentalities are sold to communications service providers for deployment in exactly those arrangements; and Ericsson has known of the ’931 Patent since at least the service of this Complaint and, on information and belief, since 2011 and 2012.

132. In the alternative, since at least its engagement with Orckit-Corrigent in 2011 and 2012, and in any event since the service of this Complaint, Ericsson has subjectively believed that there was a high probability that the Accused Instrumentalities, and their use in the manner Ericsson instructs, infringe the ’931 Patent, and has taken deliberate actions to avoid confirming that fact.

133. Ericsson’s infringement of the ’931 Patent has been and continues to be willful. Ericsson has known of Orckit-Corrigent and of the technology claimed in the ’931 Patent since

2011, when it conducted diligence on Orckit-Corrigent, approved a joint architecture, tested a joint solution and sought to integrate it into its own platform, and then proceeded with its own development, and, on information and belief, Ericsson knew of, or was willfully blind to, the ’931 Patent from that time. Since at least the service of this Complaint, Ericsson has had actual knowledge of the ’931 Patent and of its infringement, and, on information and belief, has continued to make, use, sell, offer for sale and import the Accused Instrumentalities and to induce and contribute to their infringing use, without a license and without any good-faith basis to believe that it does not infringe or that the ’931 Patent is invalid. Ericsson’s deliberate and intentional infringement warrants enhanced damages under 35 U.S.C. § 284 and renders this an exceptional case under 35 U.S.C. § 285.

134. Plaintiff has suffered and continues to suffer damages as a result of Ericsson’s infringement of the ’931 Patent. Ericsson is liable to Plaintiff under 35 U.S.C. § 284 for damages in an amount adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by Ericsson, together with interest and costs. Ericsson’s infringement has caused and will continue to cause Plaintiff irreparable injury for which there is no adequate remedy at law unless Ericsson is enjoined by this Court.

## COUNT IV
## INFRINGEMENT OF U.S. PATENT NO. 6,952,397

135. Plaintiff realleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint.

136. During the term of the ’397 Patent, and within the period beginning six years before the filing of this Complaint, Ericsson directly infringed at least claim 15 of the ’397 Patent, literally or under the doctrine of equivalents, in violation of 35 U.S.C. § 271(a), by performing every step of the claimed method in the United States, using the Accused Instrumentalities identified above

for the ’397 Patent, including the Ericsson Router 6273, Router 6274, Router 6371, Router 6471, Router 6672, Router 6673 and Router 6675 running IPOS and configured for G.8032 Ethernet Ring Protection Switching. The ’397 Patent expired on October 31, 2023, and Plaintiff seeks damages only for infringement occurring before that date.

137. Claim 15 of the ’397 Patent recites:

> 15. A method for communication, comprising: coupling a plurality of communication nodes together in a ring, so as to enable each of the nodes to transmit traffic simultaneously in both clockwise and counterclockwise directions; and configuring at least one of the nodes to receive the traffic in only one of the directions at any given time, wherein configuring the at least one of the nodes comprises configuring each of a multiplicity of the nodes in the ring to receive the traffic only in a respective one of the directions, and selecting the respective direction for each of the multiplicity of the nodes so as to balance the traffic carried in the clockwise and counterclockwise directions around the ring.

138. The following paragraphs describe how the method of claim 15 was performed on G.8032 Ethernet rings built from Ericsson Router 6273 units running IPOS during the term of the ’397 Patent. The Router 6273 is representative. By describing the preamble, Plaintiff does not concede that the preamble is limiting.

139. *A method for communication.* The claimed method is performed on rings of Router 6273 units configured for G.8032 Ethernet Ring Protection Switching. Ericsson’s datasheet listed “G.8032 Ethernet Ring Protection Switching” as a released feature of the Router 6273 in its 2019 revision, which predates the damages period, and lists it in identical terms in its 2024 revision, which postdates the expiration of the ’397 Patent; the capability was accordingly present in the Accused Instrumentalities throughout the damages period.[128]

[128] Ericsson Router 6273 Datasheet, 1/287 01-FGC 101 3700 Uen Rev F (2019), at 2; *id.*, Rev T (2024), at 2. In both revisions the entry “G.8032 Ethernet Ring Protection Switching” carries no “Future release” asterisk.

140. *Coupling a plurality of communication nodes together in a ring.* The Router 6273 implements G.8032 Ethernet Ring Protection Switching, which exists only to operate nodes coupled together in a ring. Ericsson's own patent describes the protocol: "[a] G.8032 Ethernet protection ring has one ring protection link (RPL) which is blocked in normal operation, thus avoiding loops."[129] The nodes of each accused ring are coupled together in a ring when the ring is installed.

141. *So as to enable each of the nodes to transmit traffic simultaneously in both clockwise and counterclockwise directions.* Each node of a G.8032 ring has two full-duplex ring ports, east and west, and transmits traffic on both ring links at once: "Each Ethernet ring node is connected to adjacent Ethernet ring nodes participating in the same Ethernet ring, using two independent links,"[130] and "the ETH characteristic information (ETH_CI [ITU-T G.8010]) traffic may be transferred over both ring links of any Ethernet ring node, except for the RPL on the Ethernet ring nodes where the RPL is blocked."[131] Coupling the nodes in a G.8032 ring therefore enables each node to transmit traffic simultaneously in the clockwise and counterclockwise directions. The '397 Patent uses the same labels for the same thing: the terms "'clockwise' and 'counterclockwise,' are used arbitrarily . . . to distinguish between the two opposing directions of packet flow in a ring network." '397 Patent at 1:39-43.

---

[129] U.S. Patent No. 9,699,021 B2 (assigned to Telefonaktiebolaget LM Ericsson), at 1:29-31, https://patents.google.com/patent/US9699021B2/en (last visited Sept. 21, 2026).

[130] ITU-T Recommendation G.8032/Y.1344 (03/2020), Ethernet ring protection switching, cl. 6, https://www.itu.int/rec/dologin_pub.asp?lang=e&id=T-REC-G.8032-202003-I!!PDF-E&type=items (last visited Sept. 21, 2026).

[131] ITU-T Recommendation G.8032/Y.1344 (03/2020), Ethernet ring protection switching, cl. 9.3, https://www.itu.int/rec/dologin_pub.asp?lang=e&id=T-REC-G.8032-202003-I!!PDF-E&type=items (last visited Sept. 21, 2026).

142. *Configuring at least one of the nodes to receive the traffic in only one of the directions at any given time.* The ring protection link owner node is configured to block reception on one of its two ring ports in normal operation, so that it receives the protected traffic from one direction only: "Both end nodes of the RPL are responsible for blocking the transmission and reception of traffic over the RPL when there is NR on the Ethernet ring";[132] "This results in blocking the transmission and reception of traffic on one ring port";[133] and the "RPL owner node" is "[a]n Ethernet ring node adjacent to the ring protection link (RPL) that is responsible for blocking its end of the RPL under normal conditions."[134] On a failure the block is removed and placed elsewhere, which is the "at any given time" reconfiguration. The '397 Patent describes the same arrangement: nodes "are configured to receive data in only one selected direction at any given time." '397 Patent at 3:16-18.

143. *Wherein configuring the at least one of the nodes comprises configuring each of a multiplicity of the nodes in the ring to receive the traffic only in a respective one of the directions.* On information and belief, a ring of Router 6273 nodes carries two or more Ethernet ring protection instances, each with its ring protection link on a different ring link, so that several ring protection link owner nodes are each configured to receive the traffic of their instance from one respective direction. Ericsson's datasheet states that the Router 6273 supports "G.8032 Ethernet Ring Protection Switching" without limitation to a single instance, and the standard provides for several:

---

[132] ITU-T Recommendation G.8032/Y.1344 (03/2020), Ethernet ring protection switching, cl. 9.3, https://www.itu.int/rec/dologin_pub.asp?lang=e&id=T-REC-G.8032-202003-I!!PDF-E&type=items (last visited Sept. 21, 2026).

[133] ITU-T Recommendation G.8032/Y.1344 (03/2020), Ethernet ring protection switching, cl. 9.4, https://www.itu.int/rec/dologin_pub.asp?lang=e&id=T-REC-G.8032-202003-I!!PDF-E&type=items (last visited Sept. 21, 2026).

[134] ITU-T Recommendation G.8032/Y.1344 (03/2020), Ethernet ring protection switching, cl. 3.2.10, https://www.itu.int/rec/dologin_pub.asp?lang=e&id=T-REC-G.8032-202003-I!!PDF-E&type=items (last visited Sept. 21, 2026).

"ERP instance: An entity that is responsible for the protection of a subset of the virtual local area networks (VLANs) that transport traffic over the physical Ethernet ring. Each Ethernet ring protection (ERP) instance is independent of other ERP instances that may be configured on the physical Ethernet ring,"[135] and "[e]ach ERP instance shall only block or unblock the VIDs of the traffic channels of the set of VLANs assigned for protection by that ERP instance."[136] The basis for Plaintiff's belief is that the standard provides for multiple ring protection instances on one physical ring, each with its own ring protection link blocked at both ends, as quoted above, and that Ericsson lists G.8032 among the Router 6273's released features without limiting it to a single instance. The '397 Patent does not require every node to receive in one direction, "some of the other nodes in network 46 may have receive ports on both of the rings," '397 Patent at 5:59-62, and leaves the selection method open, "[a]ny suitable protocol may be used," *id.* at 5:65-67.

144. *And selecting the respective direction for each of the multiplicity of the nodes so as to balance the traffic carried in the clockwise and counterclockwise directions around the ring.* On information and belief, the respective direction of each of the multiplicity of the nodes is selected so that the traffic carried in the two rotations of the ring is divided between them. The operator of a G.8032 ring selects where each instance's block sits, which selects the receive direction of each ring protection link owner: "There is no restriction on which ring link on an Ethernet ring may be set as RPL."[137] The standard states that "[i]t is desirable that ring bandwidth

---

[135] ITU-T Recommendation G.8032/Y.1344 (03/2020), Ethernet ring protection switching, cl. 3.2.1, https://www.itu.int/rec/dologin_pub.asp?lang=e&id=T-REC-G.8032-202003-I!!PDF-E&type=items (last visited Sept. 21, 2026).

[136] ITU-T Recommendation G.8032/Y.1344 (03/2020), Ethernet ring protection switching, cl. 9.4, https://www.itu.int/rec/dologin_pub.asp?lang=e&id=T-REC-G.8032-202003-I!!PDF-E&type=items (last visited Sept. 21, 2026).

[137] ITU-T Recommendation G.8032/Y.1344 (03/2020), Ethernet ring protection switching, cl. 9.7, https://www.itu.int/rec/dologin_pub.asp?lang=e&id=T-REC-G.8032-202003-I!!PDF-E&type=items (last visited Sept. 21, 2026).

accommodates all traffic that is protected, regardless of the ring protection switching state."[138] The basis for Plaintiff's belief is that the standard leaves the placement of each ring protection link to the operator and states that it is desirable for ring bandwidth to accommodate all protected traffic regardless of the protection switching state, as quoted above, and that ring protection instances whose protection links sit on different ring links carry their protected traffic around the ring in different directions. The '397 Patent treats the balance as approximate, describing the nodes as loading the network "more or less equally" and the result as "approximately equal loading." '397 Patent at 6:58-62.

145. The Router 6274, Router 6371, Router 6471, Router 6672, Router 6673 and Router 6675 run the same IPOS software and, according to Ericsson's datasheets, implement the same G.8032 Ethernet Ring Protection Switching feature, and the method of claim 15 was performed on rings built from each of them in the same manner as on rings built from the Router 6273.

146. Ericsson itself performed every step of the method of claim 15 in the United States during the damages period. Ericsson performed the method when it operated a customer's transport network built from the Accused Instrumentalities under a managed services agreement, in which Ericsson's personnel and Ericsson's automation configured the nodes and placed them in service, and the nodes, under Ericsson's control, carried out the remaining steps.[139] Ericsson performed the method when it deployed and integrated the Accused Instrumentalities for a customer through customer acceptance, because Ericsson performed the coupling and configuring steps and then passed traffic through the configured ring to test it before hand-over; Ericsson's deployment

---

[138] ITU-T Recommendation G.8032/Y.1344 (03/2020), Ethernet ring protection switching, cl. 7.2, https://www.itu.int/rec/dologin_pub.asp?lang=e&id=T-REC-G.8032-202003-I!!PDF-E&type=items (last visited Sept. 21, 2026).

[139] Ericsson, Managed Network Services, https://www.ericsson.com/en/managed-services (last visited Sept. 21, 2026).

services "cover end-to-end deployments from site acquisition to customer acceptance."[140] Ericsson performed the selecting step when its network design and optimization services designed or expanded a customer's ring network. Ericsson further performed every step of the method when it configured and operated the Accused Instrumentalities in the recited manner in its own United States facilities for development, testing, demonstration and customer trial. On information and belief, each of these acts occurred in the United States during the damages period.

147. In the alternative, where the coupling and configuring steps were performed by Ericsson's deployment personnel and the remaining steps were performed by the customer's operation of the configured nodes, the customer's performance is attributable to Ericsson, because, on information and belief, Ericsson conditioned the customer's receipt of the benefits of ENM auto-integration and software support on the nodes being configured and maintained in the configuration Ericsson prescribed, and Ericsson established the manner and timing of that performance through the configuration that ENM downloads to the nodes and keeps synchronized. Ericsson states that the Router 6000 portfolio "supports auto-integration with a seamless setup for the RAN transport network," which "enables the automatic discovery of the Router 6000 nodes and the automatic download of their predefined configuration," and that "each configuration is kept in sync with ENM."[141]

148. Each communications service provider that configured and operated a ring network built from the Accused Instrumentalities in the manner described above during the damages period performed every step of the method of claim 15 and directly infringed the '397 Patent.

---

[140] Ericsson, Network Deployment, https://www.ericsson.com/en/portfolio/networks/network-services/network-deployment (last visited Sept. 21, 2026).

[141] Ericsson, Router 6000 Series brochure, https://www.ericsson.com/4a4692/assets/local/mobile-transport/doc/router-6000-brochure.pdf (last visited Sept. 21, 2026).

149. During the term of the ’397 Patent, Ericsson induced the infringement of at least claim 15 of the ’397 Patent by its customers and other third parties in violation of 35 U.S.C. § 271(b). On information and belief, Ericsson knew of the ’397 Patent, or was willfully blind to it, from its engagement with Orckit-Corrigent in 2011 and 2012, as alleged in Section VI above, and with that knowledge, and with the specific intent that its customers configure and operate the Accused Instrumentalities in the infringing manner, Ericsson took active steps to encourage and facilitate that infringement, including by: designing IPOS to implement G.8032 Ethernet Ring Protection Switching with multiple ring protection instances and marketing that feature as a released capability of the Accused Instrumentalities; publishing datasheets, brochures and technical literature that instructed customers to deploy the Accused Instrumentalities in protected ring topologies; supplying customers with IPOS instruction manuals and configuration guides through its customer Extranet; installing, configuring and integrating the Accused Instrumentalities for customers through its Network Deployment services; designing and optimizing customers’ ring networks through its network design and optimization services; provisioning customers’ routers through ENM auto-integration; training customers’ and partners’ personnel in “deployment and network integration” at its Training Center of Excellence in Lewisville, Texas and elsewhere; and providing technical support, software updates and managed services for the deployed networks. Ericsson’s customers directly infringed as a result.

150. During the term of the ’397 Patent, Ericsson contributorily infringed at least claim 15 of the ’397 Patent in violation of 35 U.S.C. § 271(c) by selling, offering to sell and importing into the United States the Accused Instrumentalities, including the Router 6000 Series routers and the IPOS software that implements G.8032 Ethernet Ring Protection Switching, for use in practicing the claimed method, knowing that those components constitute a material part of the

invention of claim 15, that they are especially made and especially adapted for use in an infringing manner, and that they are not staple articles or commodities of commerce suitable for substantial non-infringing use. On information and belief, the G.8032 ring protection function of IPOS has no substantial non-infringing use: it exists only to operate nodes coupled together in a ring, in which the placement of the ring protection link fixes the direction from which each node receives protected traffic, which is the method claim 15 recites; the Accused Instrumentalities were sold to communications service providers for deployment in exactly those arrangements; and, on information and belief, Ericsson knew of the ’397 Patent, or was willfully blind to it, throughout the damages period.

151. In the alternative, during the term of the ’397 Patent, Ericsson subjectively believed that there was a high probability that the Accused Instrumentalities, and their use in the manner Ericsson instructed, infringed the ’397 Patent, and took deliberate actions to avoid confirming that fact.

152. Ericsson’s infringement of the ’397 Patent during the damages period was willful. Ericsson knew of Orckit-Corrigent and of the technology claimed in the ’397 Patent from 2011, when it conducted diligence on Orckit-Corrigent, approved a joint architecture, tested a joint solution and sought to integrate it into its own platform, and then proceeded with its own development, and, on information and belief, Ericsson knew of, or was willfully blind to, the ’397 Patent from that time and deliberately continued to make, use, sell, offer for sale and import the Accused Instrumentalities and to induce and contribute to their infringing use through the expiration of the ’397 Patent on October 31, 2023, without a license and without any good-faith basis to believe that it did not infringe or that the ’397 Patent was invalid. Ericsson’s deliberate

and intentional infringement warrants enhanced damages under 35 U.S.C. § 284 and renders this an exceptional case under 35 U.S.C. § 285.

153. Plaintiff has suffered damages as a result of Ericsson's infringement of the '397 Patent during its term. Ericsson is liable to Plaintiff under 35 U.S.C. § 284 for damages in an amount adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by Ericsson, together with interest and costs. Because the '397 Patent has expired, Plaintiff does not seek injunctive relief with respect to it.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants as follows:

A. A judgment that Defendants have directly infringed, literally or under the doctrine of equivalents, each of the Asserted Patents, and, with respect to the '673, '303 and '931 Patents, continue to directly infringe those patents;

B. A judgment that Defendants have actively induced infringement of each of the Asserted Patents during their respective terms, and, with respect to the '673, '303 and '931 Patents, continue to induce infringement of those patents;

C. A judgment that Defendants have contributorily infringed each of the Asserted Patents during their respective terms, and, with respect to the '673, '303 and '931 Patents, continue to contributorily infringe those patents;

D. A judgment and order requiring Defendants to pay Plaintiff damages under 35 U.S.C. § 284 adequate to compensate for Defendants' infringement, but in no event less than a reasonable royalty, including damages for convoyed and derivative

sales, together with supplemental damages for any continuing post-verdict infringement through entry of final judgment, with an accounting as needed;

E. A judgment that Defendants' infringement of each of the Asserted Patents has been willful during its respective term;

F. A judgment that Defendants' infringement warrants enhanced damages under 35 U.S.C. § 284, and an award of up to three times the damages found;

G. A judgment that this is an exceptional case within the meaning of 35 U.S.C. § 285 and an award to Plaintiff of its reasonable attorneys' fees;

H. A judgment and order granting a permanent injunction with respect to the '673, '303 and '931 Patents that restrains and enjoins Defendants, their officers, directors, agents, servants, employees, attorneys, licensees, parents, subsidiaries, successors and assigns, and all those in privity, concert or participation with them, from directly or indirectly infringing those patents;

I. In the alternative to a permanent injunction, a judgment and order awarding Plaintiff a compulsory ongoing royalty for Defendants' continued infringement of the '673, '303 and '931 Patents after entry of judgment;

J. A judgment and order requiring Defendants to pay pre-judgment and post-judgment interest on all damages awarded, at the maximum rate allowed by law;

K. A judgment and order awarding Plaintiff its costs of this action; and

L. Such other and further relief, at law or in equity, as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues and claims so triable.

Respectfully submitted,

*/s/ Erick S. Robinson*

Erick S. Robinson (Lead Counsel)
Texas Bar No. 24039142
Gregory Love
Texas Bar No. 24013060
**CHERRY JOHNSON SIEGMUND JAMES PC**
104 E Houston Street, Suite 115
Marshall, Texas 75670
Tel: (713) 498-6047
Fax: (713) 583-9737
erobinson@cjsjlaw.com
glove@cjsjlaw.com

Mark D. Siegmund
Texas Bar No. 24117055
"Grace" Shuya Yang
Texas Bar No. 24144144
**CHERRY JOHNSON SIEGMUND JAMES PC**
Bridgeview Center
7901 Fish Pond Road, 2nd Floor
Waco, Texas 76710
Tel: (254) 732-2242
Fax: (866) 627-3509
msiegmund@cjsjlaw.com
gyang@cjsjlaw.com

***Attorneys for Plaintiff***
***HIGH IQ NETWORKS LLC***